# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

**EDWARD ANTHONY THROOP,**

**Petitioner,**

**vs.**

**RALPH M. DIAZ,  Secretary, et al.[1]**

**Respondent.**

Civil No.    12-cv-1870-LAB(NLS)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF HABEAS PETITION**

Edward Anthony Throop ("Throop"), a state prisoner proceeding pro se and in forma pauperis, seeks 28 U.S.C. § 2254 federal habeas relief from his June 30, 2006 convictions of two counts of battery in connection with a prison riot in Imperial County Superior Court Case No. JCF15251.  He received concurrent sentences of 25 years to life for those convictions after bifurcated proceedings resulted in findings that Throop had two prior serious or violent felony convictions. The California Court of Appeal affirmed the judgment, and his petition for review was summarily denied by the

---

[1]   Respondent's request that the Attorney General, Kamala D. Harris, whom Throop named as an additional defendant, be dismissed as an improper respondent should be granted.  (*See* Ans. 12-13, ECF No. 21-1.)   The Attorney General has no custodial control over Throop and is therefore an improper respondent in a habeas corpus proceeding.  *See* <u>Brittingham v. United States,</u> 982 F.2d 378 (9th Cir. 1992).

1  California Supreme Court.  His several attempts to obtain collateral relief in the state

2  courts were unsuccessful.  Troop filed his federal petition on July 27, 2012 and a First

3  Amended Petition on December 17, 2012 ("FAP") (ECF Nos. 1, 10.)  Respondent filed

4  an Answer opposing any relief.  (ECF No. 21.)  After three extensions of time for good

5  cause shown (ECF Nos. 18, 27, 33), Throop filed a Traverse.  (ECF No. 39.)  In

6  consideration of the pertinent portions of the record and controlling legal authority, it

7  is recommended that the Petition be **DENIED**.

8  I.      **BACKGROUND**

9          A.      **Factual Background**

10         In its unpublished decision affirming the judgment, the California Court of

11  Appeal summarized the circumstances giving rise to the charges.  (Lodg. No. 10 (Cal.

12  Ct. App. Case No. D053340, Mar. 23, 2010).)  On federal habeas review, a rebuttable

13  presumption of correctness attaches to state appellate courts' factual statements.

14  28 U.S.C. §2254(e)(1); Moses v. Payne, 555 F.3d 742, 746, n.1 (9th Cir. 2009).  Throop

15  does not dispute the accuracy of the court's summary of the trial evidence, although he

16  disputes the sufficiency of the evidence to support his convictions and purports to

17  identify extrinsic evidence of alleged misconduct in the preparation and presentation of

18  the case to the jury that he argues undermines the reliability of the verdicts.

19             In November 2003 a fight broke out between two inmates in an
20      exercise yard at Calipatria State Prison, a maximum-security facility
        (Calipatria).  Calipatria has two exercise yards, "yard 1" and "yard 2,"
21      separated by a chain-link fence.  Correctional officers used pepper spray
        to stop the fight, ordered the two inmates to lie down in a prone position
22      and searched them for injuries and weapons.  When officers discovered
        that one of the inmates had sustained a puncture wound, officers expanded
23      their search to other inmates in yard 2.  When officers next found a
        weapon in yard 2, they began to search the inmates in yard 1.

24             While searching the inmates in yard 1, about 20 or 30 inmates began
25      attacking Officers Murriente and Andalon in the weight training area in
        yard 1.  Each yard has a weight training area (also known as the "weight
26      pile"), and the only way to access the weight pile is through one of two
        gates at either end of the area.

27             At or near the time of the incident in the weight pile in yard 1, about
        30 to 40 inmates in the main area of yard 1 stood, despite being ordered to
28      "stay down," and began attacking Officers Burkhammer and Silva.

2                                                                        12cv1870

Inmates in yard 2 also ignored the order to stay down, and about 20 to 30 of them rushed, and began to climb over, the chain-link fence separating yards 1 and 2. Additional officers responded to the uprising and entered the weight pile in yard 1 through the "eastern" gate, while other officers ran through the "western" gate into the main area of yard 1 to help the officers under siege.

Lieutenant Lindsay Hunt testified he saw two inmates standing outside the western gate spraying officers with pepper spray from canisters that officers had lost during the melee. Hunt testified he "actually saw" Throop, along with "Inmate Garcia," spraying officers from an MK9 canister of oleoresin capsicum, a type of pepper spray used by officers at Calipatria, as officers were running through the gate to help Burkhammer and Silva. Hunt testified the MK9 canister is barrel-shaped and about nine inches long, and is similar in appearance to a mini fire extinguisher.

Hunt testified he had "absolutely no doubt" that Throop sprayed Sergeants Morales and Johnson, and Officers Drennon, Alvarez and Leamons. Hunt also testified he saw Throop throw the MK9 canister on the ground after it stopped spraying, and run towards the center of the yard where inmates were attacking the officers.

Officer Douglas Drennon testified he was in the yard 1 weight pile helping to secure that area when he saw about 30 inmates attacking two officers in the middle of yard 1. Both officers were on the ground. Drennon testified that as he and other officers made their way through the gate between the weight pile and the main yard to help their fellow officers, they were hit with pepper spray. Drennon said he turned to the right and was able to avoid most of the spray, although he was hit on the left side of his face and in his eye.

Drennon testified there was "no doubt" that Throop sprayed him as he ran through the gate. Drennon also saw Throop throw the canister of pepper spray to the ground. Drennon testified he saw Throop spray Sergeant Morales, although he could not identify the other officer sprayed by Throop. Drennon said he realized after the riot that at some unknown point during the uprising he had lost his can of MK9 pepper spray.

Officer Randy Leamons also testified at Throop's trial. Leamons estimated that 40 inmates jumped the two officers in the middle of yard 1. As Leamons ran through the gate between the weight pile and the main yard, he saw Throop spray Morales and Drennon. Leamons was also sprayed by Throop. Leamons testified he did not try to apprehend Throop at that time because his main concern was helping the officers under attack in yard 1.

Sergeant Martin Morales testified that as he was running through the gate to help the officers in yard 1 Throop approached him and sprayed him in the face. After being hit by the pepper spray, Morales could only see out of his right eye, until he eventually lost sight in that eye as well. Nonetheless, before he was sprayed, Morales saw Throop with the canister of pepper spray, then a "split second" later Morales testified he was hit by the spray and saw Throop run away. Morales did not run after Throop because he was more concerned about the officers under attack and considered their lives to be in immediate danger.

Lieutenant (then-Sergeant) Russell Johnson testified he was in the weight pile area in yard 1 when he saw about 20 or more inmates attack Officers Burkhammer and Silva in the middle of yard 1. As Johnson was running through the gate to assist the two officers, he testified he "clearly" saw Throop spray him with pepper spray, which struck him on the right side of the face. Johnson testified his face began to burn, but that he did not stop and apprehend Throop because Johnson was concerned about the wellbeing of the two officers in what he described as the worst prison riot he had ever witnessed.

Officer David Acosta testified he was in the weight pile area of yard 2 when he heard officers yelling, "Get down, get down," and saw a large group of inmates fighting with officers. Acosta ran to the weight pile in yard 1 and pepper sprayed inmates that were not complying with the order to get down.

As that was occurring, Acosta saw two officers being attacked by a large group of inmates in the middle of yard 1. Acosta also saw inmates on yard 2 running toward, and jumping over, the center fence, and other inmates in yard 1 running toward the officers in the weight pile area. Acosta saw an MK9 canister of pepper spray outside the gate in the weight pile area. Acosta's first reaction was to secure the pepper spray. Before he could do so, however, Acosta saw Throop pick up the canister and spray Drennon. Acosta attempted to subdue Throop by spraying him with pepper spray from Acosta's MK46 canister, but was too far away and ran out of spray.

Because Acosta heard Hunt yell to an officer in the observation booth to start shooting, Acosta did not attempt to apprehend Throop. After about three shots were fired, Acosta testified the inmates began to lie on the ground in a prone position.

Officer Robin Alvarez was a security investigations officer at Calipatria on the date of the prison riot. She was in the process of investigating the stabbing in the yard 2 weight pile when she heard commotion in the weight pile of yard 1 and saw about 40 or 50 inmates attacking officers in the middle of yard 1. As Alvarez ran through the gate in the weight pile in yard 1, she was hit with pepper spray on the left side of her face. Although Alvarez did not see who sprayed her, Hunt positively identified Throop as that individual.

Officer Nell Senkel testified that she was ordered to yard 1 to search for weapons after the fight between inmates in the weight pile of yard 2. Senkel testified officers searched yard 1 because inmates sometimes passed weapons to each other through the chain-link fence separating the yards.

While searching inmates, Senkel observed officers and inmates fighting in the weight pile of yard 1. Senkel helped subdue the uprising. During the confusion, Senkel saw Throop through the chain-link fence spraying officers with pepper spray near the gate area of the weight pile in yard 1. Senkel said she had "no doubt" that Throop was the inmate using the spray, and saw the mist from the canister actually hit an officer.

4

(Lodg. No. 10, slip op. at 2-7.)

The defense theory was mistaken identity, supported primarily by expert testimony on the unreliability of eyewitness identification as well as the absence of evidence to identify whose particular pepper spray canister was lost that Throop could have picked up and used to attack the correctional officers.  (*See* Lodg. 3, RT vol. 15 at 1306-1324.)  Throop did not testify in his own behalf at trial, but defense counsel called multiple inmate and correctional officer witnesses to impugn the credibility of the prosecution witnesses.

### B.   Procedural Background

Several prosecutions arose from the November 21, 2003 prison riot. Throop was jointly indicted on February 3, 2005 in one of those proceedings with a co-defendant, George Garcia.  (Lodg. No. 1, CT vol. 1 at 0002-0009.)  Throop was charged with five counts of battery on a non-confined person in violation of Cal. Penal Code § 4501.5 while confined in a state prison within the meaning of Cal. Penal Code § 1170.1(c) (Counts 7 through 11).  Co-defendant Garcia was similarly charged in six counts (Counts 1 through 6).  Multiple continuances and intervening judicial proceedings ensued.  (*See* Lodg. No. 3, Reporter's Transcript ("RT") vols. 1- 7.)  Just before jury selection began on Wednesday, May 17, 2006, the prosecutor informed the court:

> . . .  I did relay an offer to both defendants. And that offer is that each defendant plead to one count of 4501.5; serve the midterm of three years; admit one strike, which will be a total of six years.  And I believe they'd serve 80 percent of that time.

(Lodg. No. 3, RT vol. 8 at 284-285.)

The next day, defense counsel informed the court: "Mr. Throop has received the [plea] offer and has declined to accept."  (Lodg. No. 3, RT vol. 8 at 285.) The prosecutor then revoked the offer as to Throop.  Voir dire consumed the rest of that week.  Before resuming on Tuesday, May 23, 2006, Garcia sought to enter a change of plea.  After admonitions and colloquy, the court accepted his no contest plea to the Count 1 battery charge with a recommended sentence to the upper term of four years

12cv1870

and dismissal of all remaining allegations and enhancements, including a strike allegation. (Id. at 292-297.)  Voir dire to finalize selection of Throop's jury continued through that day and the next. (Id. vol. 9, vol. 10 at 327.)  The presentation of evidence began May 25, 2006 and concluded on June 29, 2006.  (Id. vols. 10-15.)  The jury reached its verdicts on June 30, 2006, finding Throop guilty of the Count 1 and Count 2 battery charges involving correctional officers Johnson and Morales, but not guilty of the remaining three battery counts.  (Id. vol. 15 at 1356-1364.)

In bifurcated proceedings held July 11, 2006, the jury found true the allegations that Throop had two prior serious or violent felony convictions within the meaning of Cal. Penal Code §667(b) through (i).  (Lodg. No. 3, RT vol. 15 at 1368-1378.)  Throop unsuccessfully moved for a new trial on grounds that the jury must have disregarded the inconsistent testimony from Johnson and Morales that each claimed to be the first officer through the gate at the time of the incident, a purported impossibility suggesting the jury reached a "compromised verdict" warranting that the verdicts be set aside.  (Id. RT vol. 18; *see also* id. RT vol. 19 at 2002-2005.)  On November 16, 2006 at the time scheduled for sentencing, the court again denied Throop a new trial, but continued the sentencing hearing.  (Id. RT vol. 19 at 2002-2005.)  On December 14, 2006, the court addressed Throop's motion pursuant to People v. Marsden, 2 Cal.3d 118 (1970) alleging inadequacies associated with his attorney's motion for new trial.  (Lodg. No. 3, RT vol. 20.)  The court granted the motion, relieved his trial counsel, and appointed new counsel to review the new trial motion issues.  (Id. vols. 20, 21.)

With Throop waiving time for sentencing each time, the court granted new counsel additional time to obtain and review transcripts at status hearings in January, March, and May 2007.  (Lodg. No. 3, RT vols. 22-24.)  At a status hearing on June 14, 2007, the court set the hearing of the renewed new trial motion for September 13, 2007, at which time the People asked for a continuance.  The court granted additional motion hearing and sentencing continuances in October and December 2007.  (Id. vols. 25, 26.)  At the motion hearing on February 7, 2008, the court heard argument, discussed on the

12cv1870

1  record each ground presented in support of the motion, then denied Throop a new trial.

2  (Id. vol. 27.)  The court granted defense counsel's request to continue sentencing, and

3  did so again in April and June 2008.  (Id. vols. 27, 28.)

4      On July 24, 2008, the court denied Throop's motion to dismiss the prior strike

5  allegation and found he was subject to three strikes sentencing based upon his prior

6  convictions for attempted murder and murder.  (Lodg. No. 3, RT vol. 29 at 3330-3339.)

7  For detailed reasons recited on the record, after hearing argument from counsel and

8  allocution from Throop himself, the court imposed the mandatory term of 25 years to

9  life on one of the counts and a concurrent term of 25 years to life on the second count,

10  to run consecutively to the life without the possibility of parole sentence Throop was

11  already serving.  (Id. at 3337-3352.)

12      Throop appealed, alleging three grounds for relief:  denial of a fair trial and due

13  process for defense counsel's failure to challenge Juror No. 2 for cause; trial court error

14  for failure to remove Juror No. 2 for actual bias; and the purported failure of the trial

15  court to independently evaluate the evidence in denying two of his new trial motions

16  and for refusing to allow oral argument at the second of those hearings.  (Lodg. No. 5.)

17  The court of appeal affirmed the convictions in an unpublished, reasoned decision.

18  (Lodg. No. 10 (Cal. Ct. App. Case No. D053340, Mar. 23, 2010), slip op.)  The

19  California Supreme Court summarily denied his Petition For Review raising the same

20  claims.  (Lodg. No. 11; Lodg. No. 12 (Cal. Supreme Ct. Case No. S182292, Jul. 14,

21  2010).)

22      From the record lodged here,[2] it appears that Throop next filed a habeas petition

23

24  _____
    [2] Respondent represents it has lodged selective documents from several of Throop's subsequent efforts at collateral relief in the state courts as the judicial proceedings pertinent to the resolution of his federal claims: "Pertinent here are the [habeas petition] he filed in the Imperial County Superior Court[,] ECH02864, which was denied (Lod. Nos. 13, 14); those filed in the court of appeal[,] D060266 (filed August 8, 2011 – denied September 9, 2011 (Lod. Nos. 15, 16), and D062335 (filed July 20, 2012 – denied August 22, 2012) (Lod. Nos. 17, 18); and those filed in the California Supreme Court[,] S197702 (filed November 2, 2011 – denied May 9, 2012) (Lod. Nos. 19, 20)[,] S205181 (filed September 4, 2012 – denied November 20, 2012) (Lod. Nos. 21, 22)."  (Answer 9-10, ECF No. 21-1 (footnotes omitted).)  Throop contends the record does not contain transcripts from certain pre-trial proceedings from 2005 that he argues are needed in order to resolve his claims. That issue is addressed below in connection with his Ground Five IAC claims.

in the California Court of Appeal, raising fifteen grounds for relief, most of which reappear within at least one of the six discrete grounds alleged in his FAP.[3] (Lodg. No. 15; *see* Lodg. No. 16 (Ct. of Appeal Case No. D060266, Sept. 9, 2011), slip op. at 1-2.) In its reasoned decision denying him relief, applying state procedural and substantive law, the court expressly took "judicial notice of the direct appeal No. D053340 and prior petition No. D045743,"[4] and confirmed it had "read and considered" the "petition and supplemental petition" comprising the filings under review. (Lodg. No. 16, slip op. at 2.) That court concluded: "Throop's conviction was thoroughly reviewed on appeal, and he has not demonstrated a constitutional error that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted him. (*In re Clark* (1993) 5 Cal.4th 750, 797-798.)" (Id.)

Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden to plead and prove sufficient grounds for relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) Some of Throop's issues were raised and rejected on appeal (e.g. ground Nos. 5 and 6.) A petition for a writ of habeas corpus based on the same grounds as those on appeal or a previously denied petition will be denied as repetitive when there has been no change in the facts or law substantially affecting the rights of the petitioner. (*In re Martinez* (2009) 46 Cal.4th 945, 950, fn.1.) Certain of Throop's issues could have been raised on appeal and are thus successive. (*Id.* at p. 956.) Some issues are not cognizable on habeas corpus, e.g., the sufficiency of the evidence. (*In re Lindley* (1947) 29 Cal.2d 709, 723.) Throop should have exhausted his administrative remedies as to the handling of the mail by prison staff (ground No. 2.) As to the ineffective

---

[3] The court of appeal enumerated those grounds: "1. He was denied effective assistance of counsel on appeal because counsel did not ensure the transcript was accurate and did not raise all viable issues; 2. He was denied due process because he received an incomplete record after the appeal was final because prison official [*sic*] mishandled the packages; 3. He was convicted as the result of false evidence and certain witnesses were transferred, paroled or unavailable for trial; 4. His trial attorney had a conflict of interest because he represented other inmates in other proceedings; 5. He was denied a fair trial because Juror No. 2 slept during the trial; 6. Insufficient evidence supported the guilty findings; 7. His conviction was the result of outrageous government misconduct by delaying the indictment, suppressing of [*sic*] withholding discovery, showing him shackled to the jury; 8. Duplicative argument raised in ground No. 3; 9. He was denied due process because the prosecution offered inconsistent theories and facts about the same events at separate trials against other defendants; 10. His defense was impaired because he was housed under the direct supervision of 'agents for the prosecution' that interfered with his access to counsel; 11. His trial was unreasonably delayed; 12. The prosecution failed to disclose favorable evidence; 13. He was denied a fair trial because he was subjected to daily 'perp walks' in view of the jurors; 14. His conviction was unreliable because it resulted from impermissible suggestive identification procedures employed by the prosecution; and 15. The Legislature did not create remedies for state prisoners to have a fair trial." (Lodg. No. 16, slip op. at 1-2.)

[4] No "prior petition" bearing a case number "D045743" is identified in the Notice of Lodgments.

1

2

3

4

> assistance of counsel claims, Throop has not demonstrated both deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-696; *People v. Waidla* (2000) 22 Cal.4th 690, 718.)

(Lodg. No. 16, slip op. at 2.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

On November 2, 2011, Throop reasserted  all those claims in a habeas petition to the California Supreme Court. (Lodg. No. 19.)  That court denied the petition in a May 9, 2012 summary docket entry in its Case No. S187702. (Lodg. No. 20.)  Before that disposition, Throop had returned to the Imperial County Superior Court with another habeas petition, filed April 11, 2012. (Lodg. No. 13.)  In a May 16, 2012 unpublished, reasoned decision, the superior court rejected his claim that there was no substantial evidence to support his convictions on grounds his "challenge to the sufficiency of the evidence was previously brought by habeas petition and rejected by this court in case number EHC01476 in 2011." ( (Lodg. No. 14 (Imperial County Superior Court Case No. ECH01631), slip op. at 2.)  The court also rejected, as "speculative and conclusory," his allegations that he was "deprived of the testimony of co-defendant/inmate George Garcia due to a Department of Corrections and Imperial County District Attorney Office conspiracy to deprive petitioner of the alleged[ly] exonerating testimony of Garcia," finding that Throop failed to "make out a prima facie case of any such conspiracy" and failed to "demonstrate that the testimony of Garcia would have any effect on a jury given that some seven CO's testified as eyewitnesses to the batteries according to the court of appeal summary." Id. The court added: "To the extent that he alleges ineffective assistance of counsel by his trial attorney for failing to subpoena Garcia, that ground was also previously rejected by this court in the earlier petition." (Id.)

26

27

28

On July 20, 2012, Throop filed another habeas petition in the California Court of Appeal. (Lodg. No. 17.)  There he claimed that he was denied a fair trial and due process on grounds that the government interfered with his right to present witnesses,

12cv1870

his codefendant would have exonerated him but for the government's interference, the prosecutor committed misconduct, and his codefendant entered into an improper plea bargain.  (Id.)  In an unpublished, reasoned decision,  the court of appeal took "judicial notice of the direct appeal, *People v. Throop* (Mar. 23, 2010,. D053340) [nonpub. opn.] and petitioner's previous petitions for writ of habeas corpus."  (Lodg. No. 18 (Ct. of Appeal Case No. D062335 (Aug. 22, 2012), slip op. at 1.)  The court applied the state law rules from In re Bower, 38 Cal.3d 865, 872 (1985) and from  People v. Duvall, 9 Cal.4th 464, 475 (1995) that reviewing courts "presume the regularity of the proceedings that resulted in a final judgment" and that "if a petitioner has not stated a prima facie case for relief, the court will summarily deny the petition."  The court denied as meritless Throop's claim of governmental interference, denied  as speculative his argument that his codefendant's testimony would have exonerated him, and denied as without foundation his allegations of prosecutorial misconduct or an improper plea bargain.  (Id. at 2.)  The court also rejected his additional argument that his convictions were not supported by substantial evidence as a claim "considered and rejected in his previous petition," and further found "he had not shown prejudice" in those regards.  (Id.)

Finally, on September 4, 2012, Throop filed another habeas petition in the California Supreme Court, raising the same claims as the court of appeal had rejected in denying his July 2012 petition.  (Lodg. No. 21.)  The state high court summarily denied that petition in a docket entry dated November 20, 2012, citing:   "*In re Clark* (1993) 5 Cal.4th 750, 767-769; *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Swain* (1949) 34 Cal.2d 300, 304."  (Lodg. No. 22 (Cal. Supreme Court Case No. S205181, Nov. 20, 2012).)

In the meantime, on July 27, 2012, Throop had filed his federal habeas petition.  (ECF No. 1.)  On October 15, 2012, Throop filed a motion to stay.  (ECF No. 8.)  In a December 13, 2012 Report and Recommendation, this Court recommended the motion for stay and abeyance be denied.  (ECF No. 9.)  Four days later, Throop filed his FAP.

(ECF No. 10.)  By Order entered February 1, 2013, the District Judge assigned to this case denied the motion to stay as moot.  (ECF No. 12.)   Respondent filed an Answer (ECF No. 13), and Throop filed a Traverse (ECF No. 39.)

Throop's FAP enumerates six grounds for relief, some with divisible sub-claims. Ground One alleges he was denied a fair trial and due process of law because the government "interfe[r]red with compulsory process rights to present witnesses freely." (FAP 7, ECF No. 10).[5]  Ground Two alleges he was "deprived of due process, a fair jury, and a fair trial because the cum[]ulative effect of Juror No. 2's misconduct impaired the jury selection process." (Id. at 8.)  Ground Three alleges his "conviction resulted from state court failures to create remedies for abuses of discretionary power and conflicting interest in his prosecution which taken together denied him a fair trial and trial detainee rights generally applicable to criminal defendants." (Id. at 10.) Ground Four alleges the "totality of the circumstances demonstrate that petitioner's trial was infected by a pattern of outrageous government misconduct prohibited by the U. S. Constitution." (Id. at 12.)  Ground Five alleges ineffective assistance of his trial and appellate attorneys.  (Id. at 24.)  Ground Six alleges insufficiency of the evidence to support his conviction.  (Id. at 30.)

Respondent concedes the Petition is timely and the claims are exhausted, but contends Throop is entitled to no federal habeas relief.  (Ans. 2, ECF No. 21.) Respondent further asserts that Ground One, although exhausted, is procedurally barred. (Id.)

## II.    DISCUSSION

### A.    Legal Standards

#### 1.    Federal Habeas Relief

"[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."

---

[5] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 786 (2011), *quoting* Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring).  A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas courts may not "reexamine state-court determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 68 (1991); *see* Bradshaw v. Richey, 546 U.S. 74, 76, (2006) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Throop's claims because he filed his federal petition after that statute's 1996 effective date.  Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7.  "AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  Renico v. Lett, 559 U.S. 766, 779 (2010).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 131 S.Ct. at 786-87.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  Richter, 131 S.Ct. at 784.  Federal habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see* Lockyer v. Andrade, 538 U.S. 63, 73-76 (2003); *see also* Williams v.

Taylor, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test).  To be found an "unreasonable application" of the  precedent, the state court result must have been "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted); Renico, 559 U.S. at 779; see also Nevada v. Jackson, __ U.S. __, 133 S.Ct. 1990 (2013).

In applying the mandate of 28 U.S.C. § 2254(d), "only Supreme Court precedential holdings clearly establish a right, [although] our circuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent." Mendez v. Knowles, 556 F.3d 757, 767 (9th Cir. 2009).  A lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1).  Carey v. Musladin, 549 U.S. 70, 77 (2006); see Moses, 555 F.3d at 754 ("[W]hen a Supreme Court decision does not 'squarely address[]' the issue in the case it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue," and a federal habeas court "must defer to the state court's decision"), citing, inter alia, Wright v. Van Patten, 552 U.S. 120, 123 (2008).

Under the second AEDPA exception, relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)").  The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see Richter, 131 S.Ct. at 786 ("A state court's determination that a

claim lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of the state court's decision"), *quoting* Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

"A spare order denying a petition without explanation or citation ordinarily ranks as a disposition on the merits," in which case the federal habeas court "looks through" to the last reasoned state court decision rejecting the federal claim, and applies the deferential AEDPA standards to that "last reasoned decision." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim [are presumed to] rest upon the same ground"). Although an "independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law," Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000), "[i]ndependent review of the record is not de novo review of the constitutional issue," Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Rather, it is "the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853; *see also* Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). De novo review applies only to federal claims not adjudicated on the merits in state court, where § 2254(d)(1) does not bar federal habeas relief. Cullen v. Pinholster, __ U.S. __, 131 S.Ct 1388, 1400-01 (2011). After Cullen, the Ninth Circuit has held that, subject to the limitations of § 2254(e)(2), a federal habeas court may consider new evidence only on de novo review. *See* Stokley v. Ryan, 659 F.3d 802, 808 (9th Cir. 2011); *see also* Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (Only "properly presented" federal claims not adjudicated on the merits by the state courts are reviewed de novo).

Federal habeas courts reviewing prisoners' claims under 28 U.S.C. § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in" Brecht v. Abrahamson, 507 U.S. 619 (1993). Fry v. Pliler, 551 U.S. 112, 121 (2007); *see* Baines v. Cambra, 204

F.3d 964, 977 (9th Cir. 2000) (the Ninth Circuit applies the Brecht harmless error standard "uniformly in all federal habeas cases under § 2254").  Thus, even if constitutional error occurred, the petitioner must still demonstrate that the error "had substantial and injurious effect or influence in determining the jury's verdict" before relief is warranted.  Brecht, 507 U.S. at 637-38 (internal punctuation and citation omitted).

## 2. **Procedural Default**

The procedural default doctrine applies to individual federal claims a petitioner raised in state court but which were rejected there under state law barring their consideration.  A claim was not "properly filed" for purposes of subsequent federal habeas review if the state court determined some procedural or other state law obstacle foreclosed reaching the merits of the claim, such as untimely filing.  See Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005).  "As a rule, a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." Maples v. Thomas, -- U.S. --, 132 S.Ct. 912, 922 (2012) (internal punctuation and citations omitted).  The state law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication on the merits.  Walker v. Martin, __ U.S. __, 131 S.Ct. 1120, 1127 (2011); see Beard v. Kindler, 558 U.S. 53, 55, 60-61 (2009).  To qualify as a procedural bar, the state law ground must be "independent" of the federal question and "adequate to support the judgment."  Coleman, 501 U.S. at 729-32.

> A state procedural rule constitutes an "adequate" bar to federal court review if it was "firmly established and regularly followed" at the time it was applied by the state court. *Ford v. Georgia*, 498 U.S. 411, 423-424 (1991); *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999).  A state procedural rule constitutes an "independent" bar if it is not interwoven with federal law or dependent upon a federal constitutional ruling. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *Michigan v. Long*, 463 U.S. 1032, 1040-1041 (1983); *Lacrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 201).

Cooper v. Brown, 510 F.3d 870, 924 (9th Cir. 2007) (parallel citations omitted).

Although the State retains the burden to prove the adequacy of the bar, once the State raises procedural default as an affirmative defense, "the burden to place that defense in issue shifts to the petitioner." Bennett, 322 F.3d at 586.  "The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."  Id.

If the procedural default bar applies to the federal claim, the "Petitioner must establish cause and actual prejudice to avoid imposition of the bar." Cooper, 510 F.3d at 924; F.3d 1064, 1066 (9th Cir. 1999); see Coleman v. Thompson, 501 U.S. 722, 750 (1991) (To overcome a procedural default, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice").  The "cause" element requires a showing that "some objective factor external to the defense" and out of the prisoner's control prevented the petitioner from complying with state procedural rules relating to the presentation of the defaulted claims. Coleman, 501 U.S. at 753; Walker, 131 S.Ct. at 1127.  To establish "prejudice," the petitioner must show "that the errors . . . worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." Cooper v. Neven, 641 F.3d 322, 327 (9th Cir. 2011) (citations omitted).  The alternative "fundamental miscarriage of justice" normally requires a showing of actual innocence. *See* Johnson v. Knowles, 541 F.3d 933, 936 (9th Cir. 2008); *see* Schlup v. Delo, 513 U.S. 298 (1995).)

"[A] state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default," and exercised its discretion "to by-pass a timeliness issue and, instead, summarily reject the petition for want of merit."  Walker, 131 S.Ct. at 1125-26, *citing, inter alia,* Beard, 558 U.S. 53; *see also* Bennett, 322 F.3d at 580 ("A

state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim").

### B.     Ground One Is Both Procedurally Defaulted And Without Merit

Throop alleges in Ground One that the government interfered with his compulsory process rights, in violation of his Sixth and Fourteenth Amendment rights to a fair trial and due process of law, based on his unsupported representations about the content of Garcia's proposed testimony and his speculation that the government intentionally structured a plea deal with Garcia that caused him not to testify at Throop's trial.[6]  More than the mere absence of testimony is necessary to establish a violation of the Sixth Amendment right to compulsory process.  *See* United States v. Valenzula-Bernal, 458 U.S. 858, 867 (1982); *see* Washington v. Texas, 388 U.S. 14, 16 (1967) (holding that the petitioner "was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand" a percipient witness "whose testimony would have been relevant and material to the defense," due to a state rule categorically disqualifying accomplice testimony).  Moreover, the appropriate standard of review for prosecutorial misconduct, such as Throop alleges, is "the narrow one of due process," that is, whether the alleged misconduct rendered the trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); *see also* Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974).

The state courts both reached the merits of this claim and identified state law procedural obstacles to its consideration.  From the record provided, Throop appears to have first presented this claim in his April 11, 2012 habeas petition to the Imperial

---

[6]  Throop's allegations create no tension between the Fifth and Sixth Amendments.  Even if they did, a criminal defendant's Sixth Amendment right to compulsory process to secure attendance of witnesses does not necessarily include the right to compel a witness to waive the Fifth amendment privilege of self-incrimination. *See, e.g.*, Kastiger v. United States, 406 U.S. 441, 444-45 (1972); Washington, 388 U.S. at 23 n. 21 ("Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination . . . which are based on entirely different considerations . . . .").

County Superior Court. (Lodg. No. 13.)[7]  He argued there that he was deprived of Garcia's purportedly exonerating trial testimony due to a California Department of Corrections and Rehabilitation ("CDCR") and county D.A.'s office conspiracy.  That court disposed of the claim in a reasoned decision, finding:

> Petitioner does not make out a prima facie case of any such conspiracy. His allegations are speculative and conclusory.  Nor does he demonstrate that the testimony of Garcia would have any effect on a jury given that some seven CO's testified as eyewitnesses to the batteries according to the court of appeal summary [on direct review].

(Lodg. No. 14, slip op. at 2.)

Throop also presented this claim in his second habeas petition to the court of appeal, Case No. D062335, on July 20, 2012. (Lodg. No. 17.)  That court took "judicial notice of the direct appeal . . . and petitioner's previous petitions for writ of habeas corpus" before rejecting this claim on the merits in a reasoned decision. (Lodg. No. 18, slip op. at 1.)  The court found his arguments to be "speculative" and lacking "evidence of prosecutorial misconduct or an improper plea bargain," adding: "Further, he had not shown prejudice."  (Id., slip op. at 2.)  In summarily denying Throop's second habeas petition to the California Supreme Court, which also contained this claim, the court cited In re Clark, 5 Cal.4th 750, 767-69 (1993), Duvall, 9 Cal.4th at 474, and In re Swain, 34 Cal.2d 300, 304 (1949).  (Lodg. No. 22.)  Respondent argues those case citations indicate that Throop has procedurally defaulted his Ground One claims. (Answer 13, ECF No. 21-1.)

Throop argues that the rules cited by the California Supreme Court in connection

---

[7]  Respondent's May 20, 2013 Notice of Lodgments identifies Lodgment No. 13 as Throop's habeas petition to the superior court in Case No. ECH02864, and Lodgment No. 14 as that court's order denying the petition in Case No. ECH02864.  (ECF No. 22 at 2.)  In a footnote to that Notice, Respondent Lodgment No. 13 had not yet been received from Imperial County.  In a Supplemental Notice of Lodgment, filed May 28, 2013, Respondent purports to lodge both that petition and the superior court order denying that petition, i.e. "lodgments 13 and 14." (ECF No. 23.)  However, both the supplementally lodged petition and order bear the case number "EHC01631," not "ECH02864."  In the caption of the court of appeal's September 9, 2011 denial of Throop's habeas petition to that court in its Case No. D060266 (Lodg. No. 16), predating the Lodgment Nos. 13 and 14 by more than six months, the court of appeal references "Imperial County Sup. Ct. No. JCF15251 & ECH02864."  (Lodg. No. 16, slip op. at 1.)  The Court proceeds on the assumption that the actual lodged documents, rather than their case number descriptors in the lodgment notices are Respondent's intended "pertinent" documents (Answer 9-10, ECF No. 21-1),and  Troop is silent with respect to any discrepancies.

with its summary dismissal do not support a finding of procedural default.  (Traverse 17-24, ECF No. 39.)  First, he argues that "**none** of the three procedural bars that were applicable to Ground One (*Untimeliness* bar (Clark), or Successive petition (Swain) bar, or the Duval[l] bar) had been *consistently applied* by the California Supreme Court during the relevant time frames when petitioner initiated his post conviction proceedings in 2011."  (Id. at 19, *citing* Carpenter v. Ayers, 548 F.Supp.2d 736, 756 (N.D. Cal. 2008) and Wells v. Maas, 28 F.3d 1005, 1010 (9th Cir. 1994).)  Neither of those cases supports his assertion or satisfies his burden to avoid a procedural default, and neither ruling is from a court providing controlling authority for this analysis.  The district court in Carpenter found that California's 1993 Clark untimeliness and successiveness rules were not an adequate procedural bar to that capital petitioner's pursuit in federal court of certain federal claims denied on those grounds by the state court because the operative date for purposes of that analysis was just three years after the Clark decision.  The Maas case was decided under Oregon state law and has no bearing on procedural default analysis under California law.

In California, habeas petitioners may have their claims denied as untimely without a merits review if they "substantially delay" presenting them without justification.  In re Clark, 5 Cal.4th at 765, n.5.  A citation to In re Clark signals that the state court rejected the claim as untimely.  *See* Walker,131 S.Ct. at 1126, 1128 (California's untimeliness rule is an independent and adequate state procedural ground for the denial of a claim as procedurally defaulted).  A citation to Swain may also indicate that a state habeas petition is untimely under California law.  La Crosse v. Kernan, 244 F.3d 702, 704 & n.10 (9th Cir. 2001).  Although the Ninth Circuit has held that "a citation to *Swain* by itself . . .  [does not necessarily] mean that a habeas application was untimely filed," Cross v. Sisto, 676 F.3d 1172, 1178 (9th Cir. 2012), in Throop's case, the California Supreme Court's citation to Swain does not stand "by itself."  The Ninth Circuit has held that denial of a state habeas petition with citations both to Duvall and to Swain is deemed a denial on procedural grounds.  *See* Gaston v.

Palmer, 417 F.3d 1030, 1039 (9th Cir. 2005) ("In light of its citations to *Swain* and *Duvall*, we read the California Supreme Court's denial of [petitioner's] sixth habeas application as, in effect, the grant of a demurrer" and "was thus procedurally deficient under California law").   The state courts accordingly may be found to have rejected Throop's Ground One compulsory process claim as procedurally defaulted.

Throop's showings are wholly inadequate to support a finding of cause and prejudice or a fundamental miscarriage of justice adequate to overcome procedural default of the claim.  His asserted "good cause" for "delay of Ground 1" includes allegations that his appellate counsel failed to cooperate to obtain complete appellate transcripts, referring to transcripts of proceedings from 2005, a period predating his indictment, and purported interference by correctional counselors in his attempts to communicate with Garcia, among other things.  (Traverse 19-22, ECF No. 39.)  The contributions Throop argues Garcia would have made to his defense as a trial witness are speculative, and their value, even if Throop's unsubstantiated representations about the content of Garcia's testimony were true, are overstated, as discussed below. Accordingly, he fails to satisfy the "prejudice" prong of the cause and prejudice showing required to overcome a procedural default.  *See* Coleman, 501 U.S. at 753; Walker, 131 S.Ct. at 1127; *see also* Cooper, 641 F.3d at 327.

Even if the Court were to reach the merits of this claim, it warrants no federal habeas relief.  Throop fails to demonstrate that the prosecutor's actions associated with Garcia's plea agreement constituted misconduct or that the absence of Garcia's testimony at his trial rendered it so "fundamentally unfair" as to make the resulting conviction a violation of due process.  Wainwright, 477 U.S. at 181.  The prosecutor had extended a plea offer to both Throop and his codefendant shortly before trial began. Throop rejected the offer made to him, but Garcia accepted his shortly after trial began in what Throop characterizes as a government ploy to deprive him of his Garcia's trial testimony by imputing unsubstantiated motivation to the prosecution.  (FAP 7, ECF No. 10: "after [the] prosecution team learned about Garcia's plans to exonerate petitioner

they took affirmative steps to place a blanket restriction on his participation by improperly structuring a mid trial plea agreement contingent on barring his testimony in petitioner's defense.")

Throop represents that Garcia "planned to testify in his own defense at the tentatively scheduled joint trial to illustrate[] how the claims of prosecution witness Lieutenant Hunt were false (see Ground Four contention that Burkhammer was NOT stripped of pepperspray equipment by Garcia), and further intended to clarify that petitioner could not have been reliably observed by Hunt to be in the vicinity of the five alleged pepper-spray victims since he never left a seated position that was several yards to the north of Burkhammer's ordeal with Garcia." (Id.) On that basis, he argues that his "[r]ebuttal to prosecution witnesses was unfairly undermined by the government's interference with rights to have an alleged accomplice freely give evidence having material and favorable value" to the defense. (Id.) He attempts more indirectly to augment this theory with speculation that the terms of Garcia's plea bargain hampered his choice to testify because it left him "with the impression that his previously reduced charges, and/or dismissed strike, might become reinstated at the district attorney's request, which prevented [Throop's defense counsel] from subpoenaing him as an add-on to finalized witness lists." (FAP 7, ECF No. 10.) (Id.) The claim does not appear to be supported by any evidence.

The factual summary reproduced above, to which this court owes a presumption of correctness, 28 U.S.C. § 2254(e)(1), substantiates that the prosecution evidence against Throop was strong. Looking through to the state court of appeal's merits decision addressing this claim on habeas review, like the decision from the superior court before it, the state courts reasonably rejected his conclusory representation that absent the government's purported interference "it is reasonably likely he would have been acquitted." (Lodg. No. 18, slip op. at 1-2: .)

Petitioner's claim the government interfered with his right to a fair trial is without merit and his argument that his codefendant's testimony would have exonerated him is speculative. There is no evidence of

1
2
3

prosecutorial misconduct or an improper plea bargain.  To the extent petitioner is arguing his convictions were not supported by substantial evidence, that contention was considered and rejected in his previous petition.  Further, he had [*sic*] not shown prejudice.

4

(Lodg. No. 18, slip op. at 2.)

5
6
7
8
9
10

    Throop continues here to rely on the same speculative arguments in support of Ground One, without regard to the applicable standards of review, and his arguments should fare no better than they did in state court.  For all the foregoing reasons, it is recommended relief on Ground One be **DENIED** as procedurally defaulted or, alternatively, that the state court's merits result was not contrary to or an unreasonable application of clearly established federal law nor an unreasonable determination of the facts from the record presented.  28 U.S.C. § 2254(d).

11

### C.    Ground Two:  Failure To Remove Juror No. 2 For Cause

12
13
14
15
16

    Throop argues he was deprived of his due process, impartial jury, and fair trial rights on grounds that Juror No. 2 failed to reveal until the trial was underway that the Imperial County District Attorney was his cousin, and that the trial court erred in not removing Juror No. 2 on that ground.  (FAP 8-9, ECF No. 10.)  He also asserts an ineffective assistance of counsel component of this claim.  (*See* Id. at 27-28.)

17
18
19
20
21
22
23
24
25
26
27
28

    Throop relies on Cal. Penal Code § 1089, addressing the state law rules and standards for jury selection, qualifications, examination, challenges, seating, discharge, substitution and the like, in support of this claim.  (FAP 9, ECF No. 10.)   He argues that defense counsel should have been granted an additional peremptory challenge to remove that juror, relying on defense counsel's observation after the trial court "failed to remove Juror #2 for cause": "It would be a preempt if I had one" remaining.  (Id., *citing* 11 RT 583.)  However, "peremptory challenges are within the States' province to grant or withhold," and even "the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution."  Rivera v. Illinois, 556 U.S. 148, 158 (2009). Throop's attempt to inflate this incident into an instance of unconstitutional "coneal[ment] of relevant facts" and the "giving [of] misleading

answers during voir dire" is unpersuasive.  He cites Pointer v. United States, 151 U.S. 396, 408 (1894), a nineteenth century case for the general proposition that "depriving a defendant of the exercise of peremptory challenges for cause interferes with the right to due process and [a] fair trial" (Traverse 27, ECF No. 39), but only summarily argues:

> [T]he court's failure to excuse Juror #2 for cause forced an incompetent juror on the defense.  [¶]  Had Juror #2 honestly and correctly responded to material questions during voir dire, these hints of bias – if not sufficient to warrant challenge for cause – would have provided a valid basis for the defense to exercise the preempt with full freedom.  For these reasons, one of the most important of the rights secured to the accused was lost or impaired.

(FAP 8, ECF No. 10.)

The Sixth Amendment guarantees state criminal defendants a federal constitutional right to a fair and impartial jury. Duncan v. Louisiana, 391 U.S. 145, 149 (1968); *see also* Estrada v. Scribner, 512 F.3d 1227, 1238-40 (9th Cir. 2008) (the impartial jury guarantee requires that a verdict be based solely on the evidence produced at trial).  As Respondent acknowledges, "[t]he 'opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.' "  (Answer 15, ECF No. 21-1, *quoting* Smith v. Phillips, 455 U.S. 209, 216 (1982).  The Ninth Circuit recognizes three forms of bias:

> (1) "actual bias, which stems from a pre-set disposition not to decide an issue impartially"; (2) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury"; and (3) "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire" where a truthful response "would have provided a valid basis for a challenge for cause.'"

United States v. Olsen, 704 F.3d 1172, 1189 (9th Cir. 2013), *quoting* Fields v. Brown, 503 F.3d 755, 766–67 (9th Cir. 2007) (en banc)  (parallel citations omitted), *citing* McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554–56 (1984).

"Actual bias is, in essence, 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." United States v. Mitchell, 568 F.3d 1147, 1151 (9th Cir.2009), *quoting* United States v. Gonzalez, 214

F.3d 1109, 1112 (9th Cir. 2000); *see* Fields, 503 F.3d at 767 ("Actual bias is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view").  "A defendant who asserts that a juror was actually biased against him bears the burden of demonstrating both the bias itself, and the court's erroneous refusal to strike the juror on the basis of that bias."  United States v. Martinez–Martinez, 369 F.3d 1076, 1081-82 (9th Cir. 2004) (citation omitted).  The "determination of whether a juror is actually biased is a question of fact."  Fields, 503 F.3d at 767.  Reviewing courts accord particular deference to a trial court's credibility determinations "based, as they are, on firsthand observations unavailable to us on appeal," People v. Barnwell, 41 Cal.4th 1038, 1053 (2007), because the trial court is in a superior position "to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht v. Brown, 551 U.S. 1, 2 (2007).

The Ninth Circuit has recognized implied bias in two contexts: first, "in those extreme situations 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances,' " Fields, 503 F.3d at 770, *quoting* Gonzalez, 214 F.3d at 1112; and second, "where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury," id., *citing* Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en banc).  To get a new trial based on a juror's responses in voir dire, a party must demonstrate that the juror failed to answer honestly and that a correct answer would have provided a basis for challenge for cause.  *See* McDonough Power Equipment, 464 U.S. at 554–56.

The court of appeal addressed this claim on direct review of Throop's conviction, after supplemental briefing following an ordered augmentation of the record to include the reporter's transcripts of the voir dire proceedings. (Lodg. Nos. 7, 8;  *see* Lodg. No. 4, Augmented RT ("ART") vols. 1-5.)    The voir dire of Juror No. 2 appears in

Augmented RT vol. 3 at 407-417 and vol. 4 at 426-428.  From the voir dire record, Throop complains that several prospective jurors revealed they had relatives or acquaintances working in the district attorney's office, each of whom "was specifically questioned about those relatives and acquaintances," while Juror No. 2 "sat silently with his eyes closed."  (FAP 8, ECF No. 10, *citing* 3 ART at 400-406, 4 ART 476, 547-548, 556-7, 575, 638.)  One prospective juror had disclosed that she was acquainted with the Assistant District Attorney, and a second disclosed that she was related to the District Attorney, Gilbert Otero.  Both were questioned about their relationships to those officials.   "At the request of defense counsel, those who revealed emotional involvement were excused by the Court for cause, or peremptory challenge." (Id., *citing* "4 ART 556-557, 558, 565-566.")

After trial began, Juror No. 2 approached the court and disclosed that he had forgotten to mention the D.A. was his cousin.  (Lodg. No. 3, RT vol. 11 at 580-583.) Throop characterizes the "surprise" acknowledgment to the court and counsel "that DA Otero was also a relative of his, and that they visited several times a year, the last of which was one month before trial" as substantiating his claim of intentional concealment constituting bias.  (FAP 8, ECF No. 10, *citing* 11 RT 580-583.)  Juror No. 2 described visits with his cousin as "not really" very often, about "two or three times, maybe, a year," and stated that they did not discuss the D.A.'s work.  (Lodg. No. 3, RT vol. 11 at 580-581.)

The court of appeal declined to disturb Throop's conviction on any ground associated with the retention of Juror No. 2.  The court extracted the facts from the voir dire record that Juror No. 2 had identified two nephews who worked at Calipatria prison, one as a correctional officer and one as a teacher, and that he also volunteered an admission that he had recently noticed he was developing memory problems.  (Lodg. No. 10, slip op. at 8-9.)  "After a day and [a] half of trial testimony, and outside the presence of the jury, Juror No. 2 informed the court and counsel that during voir dire he had forgotten to disclose that he and Riverside District Attorney Gilbert Otero were

cousins."[8] (Id. at 9.)  The court reproduced in its decision the resulting colloquy among the court, counsel, and Juror No. 2.  (Id. at 9-13.)  Based on that record, the court found no "concealment" occurred.

> Assuming Juror No. 2 was required to disclose during voir dire that he and the Riverside district attorney were cousins, the record supports the (implied) finding that Juror No. 2's failure to do so was unintentional and inadvertent.  (See *People v. Wilson*  [(2008) 44 Cal.4th 758] at p. 823.) Indeed, Juror No. 2 was forthcoming in voir dire regarding information about his two nephews who worked at Calipatria.  He also volunteered he recently had experienced problems with his short-term memory.

> Moreover, the record shows that at the time Juror No. 2 made the disclosure about his cousin, he did so of his own accord.  Juror No. 2 reiterated to the court and counsel that he sometimes "forg[o]t things," as he had volunteered during voir dire, and explained the circumstances of how he came to realize that he had forgotten to inform the court and counsel that his cousin was the Riverside district attorney.  The record also shows Juror no. 2 volunteered this information outside the presence of the jury, telling the court and counsel, "I thought I better bring it up."

> On this record, we conclude substantial evidence supports the finding of the trial court that Juror No. 2 did not intentionally withhold information in voir dire regarding his cousin, and that his failure to disclose that information, to the extent he was required to disclose it, was inadvertent and unintentional. (See *People v. Wilson*, *supra*, 44 Cal.4th at p. 823.)

(Lodg. No. 10 at 15.)

No finding of unconstitutional bias is warranted from this record,  including the in chambers proceeding.  The Imperial County D.A. does not appear to have had any personal involvement in Throop's trial.  Throop cites no authority for the proposition that merely having a relative who is head of the prosecuting agency qualifies as a circumstance rendering it "highly unlikely the average person" could deliberate impartially as a juror.  The court of appeal acknowledged the record reflected that the Juror No. 2 hesitated or expressed uncertainty in some of his responses to a series of questions the trial court posed to assess his impartiality.  Nevertheless, the court substantiated that the trial court obtained sufficient reassurances that the juror did not think his cousin's occupation would make a difference in how he viewed the evidence,

---

[8]  The court of appeal incorrectly identifies Gilbert Otero as the district attorney in Riverside County. An official Imperial County website identifies Gilbert Otero as that county's district attorney.  Throop was tried in Imperial County.

and that he could wait until all the evidence was heard before taking one side or the other, to support with "substantial evidence" the juror's qualification "to continue serving on the jury after the disclosure." (Lodg. No. 10, slip op. at 16.) The court of appeal additionally noted:

> After discussion with Juror No. 2, defense counsel observed that there likely was no good cause to excuse Juror No. 2, and that it appeared to defense counsel that Juror No. 2 was "uncomfortable." The prosecutor left it up to the defense whether to move to excuse Juror No. 2, although she added Juror No. 2 appeared to be "sleeping" or "resting his eyes in the trial. The court agreed with defense counsel there was no good cause to excuse Juror No. 2, noting that if Juror No. 2 "didn't remember he is related to the D.A. until now, it just doesn't seem likely that they're that close. So we're – I guess we'll go on with him."

(Lodg. No. 10, slip op. at 16-17 (footnote omitted).)

Throop also seizes on the prosecutor's passing observation that Juror No. 2 was seen possibly "sleeping" during voir dire to bolster this claim. (FAP 9, ECF No. 10, *citing* 11 RT 583.) The prosecutor "intimated that Juror #2 may have missed the previous voir dire discussions regarding DA employees familiar to jurors (as opposed to merely forgetting about his family connection) because that juror had been "noticed . . . sleeping quite frequently, but that's another issue." (Id.) The suggestion that Juror No. 2 was inattentive during the voir dire questioning of the other prospective jurors actually undermines Throop's theory that Juror No. 2 intentionally omitted the information he later voluntarily imparted to the court. In addition, the court of appeal noted that Throop did not raise that issue in the appeal and the juror was not challenged on that ground at trial, observing:

> . . . [W] note the prosecutor's statement he was "sleeping" or "resting his eyes" at the beginning of what turned out to be a lengthy trial is insufficient to establish cause to remove Juror No. 2. (See *People v. Bowers* (2001) 87 Cal.App.4th 722, 731 (concluding a juror cannot be discharged for sleeping unless there is convincing proof the juror actually slept.) Moreover, the record shows there were no other instances in which Juror No. 2 slept or rested his eyes during the remainder of the lengthy trial.

(Lodg. No. 10, slip op. at 17 n.10.)

Throop relies on the wholly speculative inference that the juror's family tie to the

27

12cv1870

District Attorney must have predisposed him in favor of the prosecution.  He fails to show that Juror No. 2 had any "preset disposition not to decide an issue impartially," or of any relationship "to the crime itself or to someone involved" in the trial, or of any "repeated lying" about a material fact in order "to get on the jury" to support a finding of implied bias.  *See* Green v. White, 232 F.3d 671 (9th Cir. 2000); Dyer, 151 F.3d 970.  Throop's trial attorney conceded the circumstances offered no ground for a valid challenge for cause. (*See* Lodg. No. 10, slip op. at 16-17.  As soon as Juror No. 2 informed the court of his relationship to the district attorney, the court and counsel thoroughly assessed his fitness to serve on Throop's jury.  "[T]he trial court and counsel believed Juror No. 2 was honest in his assessment of his ability to be fair and impartial, in light of the fact defense counsel said he did not believe good cause existed to excuse Juror No. 2, a conclusion also reached by the trial court."  (Lodg. No. 10, slip op. at 17-18.) ; *see also* Perez v. Marshall, 119 F.3d 1422, 1426-27 (9th cir. 1997) ("[O]n habeas review, a trial court's findings regarding juror fitness are entitled to special deference" and should only be disturbed if there is "manifest error").

It is recommended the Court find from this record that the state courts reasonably concluded Throop establishes no basis to disturb his conviction on the basis of the alleged misconduct of Juror No. 2.  Even if constitutional error occurred in defense counsel's or the trial court's handling of the issue, Throop has not demonstrated that the error prejudicially affected his trial.  28 U.S.C. § 2254(e)(1); Brecht, 507 U.S. at 623, 637.  Without a showing of prejudice, federal habeas relief is unavailable.  Bains, 204 F.3d at 977.  According the requisite deference to the objectively reasonable result of the state courts on the merits of Throop's juror misconduct claim, it is recommended that relief on Ground Two be **DENIED**, as he is not in custody in violation of any federal right on this theory.  28 U.S.C. § 2254(a), (d).

### D.　　Ground Three:  Denial Of Pretrial Detainee Rights And Prejudicial Custody

Throop summarizes his Ground Three claims with broad imprecision.

> Petitioner's conviction resulted from state court failures to create remedies for abuse of discretionary power and conflicting interest [sic] in his prosecution which taken together denied him a fair trial and trial detainee rights generally applicable to criminal defendants under the Fifth Sixth & Fourteenth Amendments to the United States Constitution.

(FAP 10, ECF No. 10 (typography modified).)

Throop variously characterizes his prison custodians as "agents of the prosecution" and also as "private parties" with a personal interest in the outcome of the trial. (FAP 10, ECF No. 10.) He argues: the "allegations against petitioner transpired on a prison recreation yard" and the "unit's staff were among the approximately 100 guards whose involvements in the incident required counsel to interview or subpoena to trial, while those same officials also administered petitioner's court transportation, visiting schedules for attorney (or family), handled his correspondences / legal mail, controlled his out of cell exercise, inspection of crime scene evidence, etc." (FAP 10, ECF No. 10.) He sweepingly elaborates:

> As delineated in Ground 4, those agents of the prosecution made petitioner's due process a mere formality because they engaged in patterns of misconduct and abuse of administrative discretion to interfere with compulsory process rights, withheld favorable evidence, harassed petitioner into changing his plea, committed jury embracery [sic], and employed post-arraignment investigative tactics to elicit information about defense strategies or incriminating statements. Moreover, multiple prosecution witnesses, which included a DA Liaison Officer, improperly capitalized upon their access to findings and conclusions of internal CDC investigations, or other administrative reports compiled by the prosecution team concerning the circumstances of the alleged offense, to help advance purely private litigation that was not closely related in furtherance of criminal law enforcement.

(FAP 10, ECF No. 10.) The discrete claims "delineated in Ground Four" that Throop invokes in support of Ground Three are addressed in that section, below.

Ground Three encompasses multiple claims Throop argues contributed to a "pattern of misconduct [that] affected trial." (FAP 11, ECF No. 10.) Respondent states its understanding of the claims as: "Throop thinks that the CDCR should not have been his custodian during the pendency of his criminal prosecution in this case." (Answer 18, ECF No. 21-1.) Throop articulates numerous criticisms of California's "statutory framework" regulating the physical custody, supervision, and housing restrictions of

prison inmates who are also pretrial detainees awaiting "completion of criminal proceedings related to in-custody offenses. . . ."[9]  (FAP 10, ECF No. 10.)  In particular, he argues that his constitutional rights were violated because:  "ambiguities within the statutory framework" permit the delegation of housing supervision and physical custody to "victims and subpoenaed witnesses" in the pending proceedings when the charged crime occurred while the named defendant was an inmate.  (Id.)  He contends his prosecution was "unfair" because "the prosecution team [was not] free from influence of private parties [having] particular reasons for wanting to see him convicted," apparently referring to prison staff.  (Id.)  He challenges the denial of defense counsel's "peremptory petition to disqualify the CDC as the prosecution's representative and custodian housing petitioner during trial," due to alleged "conflicts of interest manifested among its personnel tasked with ensuring his access to court and basic pretrial detainee rights," invoking the court's "supervisory power to protect the integrity of the judicial process."  (Id., *citing* "CT 131 at Exhibit 202".)

Federal habeas courts do not exercise "supervisory powers" over state courts.  A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Throop cites no United States Supreme Court authority for the proposition that his status as a convicted state prisoner serving a criminal sentence who is awaiting an indictment and trial for new criminal conduct while incarcerated in the

---

[9] Throop adds in his Traverse that he purportedly has "new proof" of "deliberate government intrusion" through a purported "administrative strategy" at Calipatria that he identifies as admissions by former warden Larry Scribner and four correctional officers in a different case from this District that he identifies as David Cota v. Scribner, Case No. 09cv2507, purportedly presenting complaints that "they oversaw an administrative strategy . . . which was designed to identify, investigate and subdue any Calipatria prisoners having suspected predisposition for staff assaults with strategic threat group affiliations."  (Traverse 31, ECF No. 39.)  Throop provides as "Exhibit A" to the Traverse two expert reports submitted in connection with a prisoner civil rights case brought by an inmate alleging racially discriminatory lockdowns and challenging efforts to classify that plaintiff as a gang member.  (Id. at 59- 84.)  Evidence associated with that matter is wholly immaterial to the issues presented in Throop's FAP and has no bearing on the permissible scope of review associated under AEDPA standards.  Moreover, this Court already declined to take judicial notice of those expert reports in connection with this case when it denied his motion for appointment of counsel.  (*See* ECF Nos. 29, 31, 33.)

institution where he is serving his original sentence, on that basis, entitles him to any particular custody modification.  Throop's imaginative complaints regarding California's "statutory framework" governing the state's administration of its criminal justice system fall outside the permissible scope of this Court's review.   General appeals to broad constitutional principles, such as due process and the right to a fair trial, do not suffice to state a federal claim cognizable on habeas review, any more than such statements suffice to exhaust federal claims in state court.  *See, e.g.*, Castillo v. McFadden, 399 F.3d 993, 1000–02 (9th Cir. 2005) (concluding it is not sufficient to engage in "scattershot citation of federal constitutional provisions" divorced from "any articulated federal legal theory . . ."). The proper avenue for prisoners to pursue complaints about their conditions of confinement, as opposed to claims affecting the fact or duration of their custody, is a civil action pursuant to 42 U.S.C. § 1983.

Respondent correctly observes that "federal courts defer to prison officials to determine the proper placement of inmates, as [sic] among the 'wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.' " (Answer 18-19, ECF No. 21-1, *citing* Meachum v. Fano, 427 U.S. 215, 224-25 (1976).) "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." McKune v. Lile, 536 U.S. 24, 39 (2002), *citing* Meachum, 427 U.S. at 225.

On the issue of alleged improper influences brought to bear on the prosecution by the "private party" CDCR officers who were injured during the prison riot, Throop represents that the injured officers pursued worker's compensation insurance claims and civil damages in Imperial County Small Claims Court against some of the inmates. From those extraneous allegations, he speculates that "prison officials overseeing the custody of petitioner and his coindictees held personal and financial interests in the outcome of their criminal prosecution" which all hinged upon portraying and characterizing their supposed injuries from pepperspray exposure as attributed to the actions of an inmate (i.e. petitioner) as opposed to a fellow employee's recklessness."

(FAP 10-11, ECF No. 10).  Throop also imputes to "retaliatory animus" of correctional officers acting as "agents of the prosecution" other conduct he argues contributed to denying him a fair trial.

> The resulting pattern of misconduct affected trial by causing petitioner's conviction to rest on inappropriate considerations not validly before the jury because the retaliatory animus of agents of the prosecution orchestrated unusual shackled escorts alongside jurors, and discouraged inmate witnesses at CAL from cooperating with this defense through brutality, threats or contrived administrative discipline.

(FAP 11, ECF No. 10, *citing in support* two inmate declarations "at Exhibits 223-228.")

The shackling issue is addressed below in connection with Ground Four, where Throop raises it as a discrete claim.  Concerning his allegations of obstruction of access to inmate witnesses, Respondent substantiates that after Throop's attorney complained to the trial court that he and his investigator were having difficulty arranging interviews with inmates in 2005 and 2006 due to prison regulations, "the court offered to issue appropriate orders to accommodate counsel."  (Answer 19, ECF No. 21-1, *citing* FAP at 10, Exhs. 202-210.)  "Throop offers no evidence that indicates his complaints were not subsequently and adequately addressed."  (Id.)  At trial, the defense presented forty trial witnesses:  seven inmates and thirty-one correctional officers or other individuals associated with the CDCR.  (*See* Lodg. No. 3, ECF No. 22-11, Master Index at 4-7; Lodg. No. 3, RT vol. 11 at 736-781, vol. 12 at 782-1023, vol. 13 at 1024-1163, and vol. 14 at 1164-1173.)

To the extent a cognizable federal claim could conceivably be extracted from Throop's presentation of Ground Three, it is recommended the Court find he has failed to satisfy either exception to the deference federal habeas courts owe to state court results on the merits. 28 U.S.C. § 2254(d)(1), (2).  As he has not demonstrated that he is in custody in violation of federal law on this vague theory, relief should be **DENIED**.

### E.   Ground Four:  Pattern Of Government Misconduct And Cumulative Error

Throop's Ground Four presents a number of disparate claims in support of a "totality of the circumstances" argument for habeas relief, alluding broadly to the

federal constitutional guarantees of due process and a fair trial.  He alleges as instances of "Pretrial" governmental misconduct:  (a) unreasonable prosecutorial delay to gain tactical advantage; (b) deliberate and unfair intrusion into his attorney-client relationship with post-indictment investigations and interrogation techniques intended to elicit privileged information; (c) failure to disclose evidence favorable to the accused; and (d) improper plea bargain conditions caused the unavailability of co-defendant Garcia's testimony at trial. (FAP12-17, ECF No. 10.)  He alleges as "Trial" defects: (e) due process violation through the prosecution's proffered inconsistent facts and theories regarding the same charges at the separate trials against his coinductees "concerning elements of <u>his</u> involvement"; (f) his conviction was based on false testimony; (g) unreliable conviction due to "impermissibly suggestive identification procedures"; and (h) subjection to "daily nonroutine escorts in shackles viewed by jurors to circumvent pretrial orders to remove his handcuffs in their presence." (<u>Id.</u> at 18-23.) He summarily contends:  "Ground Four shows the prosecuting agency acted with bad faith" in a manner "intentionally designed to disrupt and interfere with petitioner's trial defense." (Traverse 35, 36 ECF No. 39 (typography modified).)

### 1.   <u>Preindictment Delay</u>

The prison riot giving rise to Throop's criminal prosecution along with those of numerous other inmates, occurred on November 21, 2003.  He alleges a felony complaint was forwarded to the D.A. in February 2004, but he was not arraigned on those charges until February 2005. (FAP 12, ECF No. 10.)  He alleges the "prosecuting agency" engaged in "unreasonable preaccusation delay to intentionally gain tactical advantages," conduct he asserts rendered "his trial . . . fundamentally unfair" in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. (FAP 12, ECF No. 10 (typography altered).)

While the Sixth Amendment right to a speedy trial does not attach until a suspect is formally charged or arrested, <u>Doggett v. United States</u>, 505 U.S. 647, 651-52 (1992), <u>United States v. Marion</u>, 404 U.S. 307, 325 (1971),  the potential prejudicial effect of

delays in charging a suspect are subject to scrutiny under the Due Process Clause. United States v. MacDonald, 456 U.S. 1, 7 (1982); *see* United States v. Lovasco, 431 U.S. 783, 788-90 (1977), *citing* Marion, 404 U.S. at 320-21.  "[P]roof of actual prejudice" is generally a necessary element to prevail on a claim alleging excessive pre-indictment delay and "makes a due process claim concrete and ripe for adjudication," but  prejudice alone does not "make[] the claim automatically valid." United States v. Lovasco, 431 U.S. 783, 789, 792-96  (1977) (declining to adopt a rule requiring prosecutors to make charging decisions at any particular point during an investigation, and holding that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time").  Reliance "solely on the real possibility of prejudice inherent in any extended delay," such as "that memories will dim, witnesses become inaccessible, and evidence be lost," are possibilities not in themselves adequate to show that a defendant could not receive a fair trial due to pre-indictment delay.  Marion, 404 U.S. at 325-26.

The government is not required "to make charging decisions immediately upon assembling sufficient evidence to establish guilt" because, among other things, that would "preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases."  A prosecutor may have wide latitude to decide when to seek an indictment, especially when [as here] a case involves more than one person."  United States v. Sherlock, 962 F.2d 1349, 1355 (9th  Cir. 1989), *citing* Lovasco, 431 U.S. at 792-95.

Throop states that on March 10, 2006, "trial counsel moved to dismiss the charges by demonstrating how the DA Office was in collusion with CDC/Cal Investigative & Security Units (ISU) to deliberately delay petitioner's indictment in bad faith, and not out of convenience nor legitimate continuing need to investigate," and that the delay had impaired his defense.  (FAP 12, ECF No. 10.)  He argues that the government engaged in only "the pretext of an investigation," and that the trial court

applied an improper standard of review in denying the motion that purportedly absolved the State of its burden to articulate reasonable justification for the delay. (Id.) He further argues:

> . . . [T]here were no suspects at large or other extenuating circumstances that warranted extensive investigations because the subject offense was an in-custody melee confined to a prison recreation yard [on November 21, 2003], for which all 75 inmates within its perimeter were immediately isolated regardless of race or involvement until the January 15, 2004 completion of crime/incident report #CAL-FAY-03-11-0592. Then throughout 2004, those same finalized administrative documents held in the possession of the [ISU] became utilized as the preponderance of evidence by correctional officers involved in the disturbance, for strategically harassing petitioner (and numerous inmate coindictees) with false or frivolous claims for civil damages against them in the Imperial County Small Claim[s] Court. See Petitioner's subpoenas filed in Small Claims Court on August 25, 2004 at Exhibits 168-172.

(FAP 12, ECF No. 10.)

Throop alleges that the prosecutors "collaborated with the ISU's DA Liaison (CO Alvarez)" as "quasi-civil advisory attorneys to coordinate" that "purely private litigation in a ploy that compelled" the prospective inmate defendants in the prison riot criminal case, including himself, "to submit handwritten inmate declarations" in order to "defend[] property rights at civil hearings." (FAP 12, ECF No. 10.) Based on those speculative motives, he urges the Court to "infer[] circumstantial evidence that prosecutors deliberately sandbagged petitioner's Grand Jury indictment until after small claims judgments had been taken against him in absentia . . . because Alvarez had already filed the felony complaint against him to the DA in February 2004" but "the prolongation of arraignment [lasted] until February 2005." (Id.) He identifies the prejudice from that alleged conduct as including that "impeachable statements in the private litigation were later exploited by the prosecution team during grand jury and trial to tactically bolster their witnesses' testimony," contributing to the purported "fundamental unfairness" of his trial, "because it further created POSTaccusation hi[n]d[r]ances to defense efforts to locate witnesses." (Id. at 13.)

Respondent fairly summarizes this claim as alleging "the prosecution delayed seeking an indictment because it was in 'collusion' with the CDCR and Calipatria's

[ISU]" and was purportedly acting with alleged "deliberate . . . bad faith delay." (Answer 20, ECF No. 21-1.)  Respondent further observes that "the Supreme Court has repeatedly noted that charging decisions generally rest within the prosecutor's discretion."  (Id., *citing* Bordenkircher v. Hayes, 424 U.S. 357, 364 (1978) (" '[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' " so long as " 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification' "), *quoting* Oyler v. Boles, 368 U.S. 448, 456 (1962).)

Throop relies on Strunk v. United States, 412 U.S. 434 (1973) for the proposition that "[t]he accused has an interest in being tried promptly, even though he was confined in a penitentiary for an unrelated charge." (Traverse 37, ECF No. 39.)  Reprising some arguments from Ground Three, he represents that notices of charges were issued to himself and about 75 other inmates following the prison riot, which he characterizes as the "the moment of their 'arrest' pending investigation and collection of evidence by members of the Calipatria prison's ISU."  (Id.: "Incident Packages were issued to petitioner and over 40 other inmates for allegations of PARTICIPATION IN A RIOT to BATTERY" on January 15, 2004, which he characterizes as an event constituting the conclusion of findings.)  He contends he "asserted his rights to Demand Trial pursuant to [Cal.] Penal Code 1381" on March 19, 2004 after he was notified that his case had been filed with the District Attorney's office, "out of concern that his ability to locate witnesses [favorable to] his defense would become impaired" due to inmate and staff transfers out of Calipatria.  (Id. at 37-38.)  He argues that "delaying the indictment for 15 months -- until February 22, 2005 -- was prejudicial" and purportedly served no "*valid* police purpose of criminal prosecution."  (Id. at 38, *citing* Barker v. Wingo, 407 U.S. 514, 531 (1972).)

The analysis of prejudicial delay entails essentially the same "two prong" test under either the Sixth Amendment or the Fifth Amendment standards.  The defendant must prove "actual, non-speculative prejudice from the delay" and that "the delay, when

balanced against the prosecution's reasons for it, offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' " Sherlock, 962 F.2d at 1353-54, *quoting* Lovasco, 431 U.S. at 790; *see* Moran, 759 F.2d at 782 ("The defendant has a heavy burden to prove that a preindictment delay caused actual prejudice:  the proof must be definite and not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case") (citations omitted).  Only if the claimant first shows actual prejudice need the court balance the length of delay against the government's reason for the delay.  Lovasco, 431 U.S. at 790.

The court of appeal rejected this claim on the merits along with the 14 other enumerated grounds for relief in its reasoned decision denying Throop collateral relief in its September 9, 2011 decision.  (Lodg. No. 16.)  That court's conclusion that the delayed indictment did not prejudice the outcome of Throop's trial is not contrary to nor an unreasonable application of any United States Supreme Court holding, *see* Richter, 131 S.Ct. at 785-86, nor an unreasonable determination from the facts, and is entitled to deference.  28 U.S.C. § 2254(d), (e)(1).  The record of the chaotic prison riot and the considerable investigation required before the prosecution could responsibly issue the indictments against Throop and dozens of other participating inmates on individualized charges amply support that result.  He has not made the required showing of "actual, nonspeculative delay" which, considered against the magnitude of the charging process in these circumstances, suggests that he consequently received a trial that violated "fundamental conceptions of justice."  Sherlock, 962 F.2d at 1353-54; Lovasco, 431 U.S. at  790.  Relief on this theory is not warranted.

## 2.    Intrusion Into Attorney/Client Relationship

Throop represents he has "circumstantial evidence," predicated on "information and belief," that "illicit intrusions" by certain of his "housing custodians," caused prejudicial interference in the preparation of his defense. (FAP 13, ECF No. 10.)  He identifies the alleged misconduct as "opening and reading confidential mail,

eavesdropping on attorney visits" and "manipulating conditions" of his segregated confinement "that permitted agents of the prosecution to freely taunt, or initiate communications with him about circumstances of the subject offense, or to gain a tactical advantage prior to offering their testimony at the later trial, or to otherwise pressure petitioner and his codefendant to change their pleas or reconsider subpoenaing guards as defense witnesses." (Id.)  He further alleges that in "collaboration with the DA, ISU conducted surreptitious post-indictment prying into defense strategies . . . that were designed to discern impeachable or incriminating statements and tactical information," then purportedly "after the prosecution team successfully discovered the flaws in their own case by monitoring privileged communications, they took affirmative steps to withhold information and evidence favorable to petitioner's defense." (Id.)  He vaguely identifies the resulting  prejudice from that alleged misconduct as: "words or actions reasonably likely to elicit derivable responses by alleged victims, and subpoenaed witnesses, routinely subjected petitioner to an atmosphere of egregious conduct and harassment intended to psychologically subvert the attorney-client relationship with CDC methods of badgering, provoking and other express questioning or its functional equivalent."  (Id. at 14.)

    As a particular example in support of those representations, Throop recites that on December 23, 2005, particular correctional officers allegedly "orchestrated a ruse to lure petitioner into interrogation rooms under false pretenses of an attorney visit from trial counsel," then threatened him "with physical force or adverse administrative consequences if he refused to participate in their interview" after he "detect[ed] their deception" and "became uncooperative." (FAP 13, ECF No. 10.)  He represents that he "was not permitted to leave and rights to counsel ignored." (Id.)  As he left that area, he alleges he discovered that prosecution witness and D.A. Liaison officer Alvarez (one of the victims in the incident) "and other CDC or DA investigators were monitoring the room from behind a mirrored wall." (Id. at 13-14.)  He further alleges "on information and belief" that those officers "compiled their own reports concerning the interview that

they classified as confidential documents to ensure [defense counsel] could not access it for inclusion within the motion to dismiss." (Id. at 14.) He also contends that photo logs were "doctored" for the purported purpose to "conceal . . . duplicity." (Id.)

Based on those speculative inferences and innuendo, Throop contends the "adverse effects" of that alleged conduct "were not revealed until the initiation of trial." (FAP 14, ECF No. 10.) He argues "[t]he Courts' failures to give consideration to the totality of pretrial government intrusions and subterfuge acquiesced a chill on [sic] attorney collaborations with petitioner, or his inmate witnesses, and became substantially prejudicial for the defense." (Id.)

Contrary to Throop's representation, the California Court of Appeal expressly stated that it had taken judicial notice of Throop's direct appeal and a prior petition, and that it had "read and considered" the "petition and supplemental petition" under review, before denying him collateral relief in its September 2011 opinion. (Lodg. No. 16.) Applying the requisite deference to state court results on the merits of any federal constitutional claim that might be extracted from Throop's rambling narrative, and in the absence of a holding from the United States Supreme Court that controls the disposition of any such claim, the Court should find he fails to satisfy AEDPA standards on a theory of government intrusion into the attorney/client relationship. 28 U.S.C. § 2254(a),(d).

### 3.    Failure To Disclose Exculpatory Evidence

Throop alleges he was denied due process for the prosecution's failure to disclose to him favorable evidence "in possession of the investigative agency." (FAP 14, ECF No. 10 (typography altered).) The allegedly withheld evidence is some photographs taken during or after the prison riot and the confiscated clothes he was wearing at that time. He also speculatively alleges that he "is informed and believes that several inmates, including Victor Parra, provided statements to the ISU team(s) that had exculpatory value to his defense," relying for that assertion on his own declaration describing hearsay remarks he attributes to Parra after that inmate's trial, and that the

prosecution failed to comply with his attorney's discovery demand for "statements of all defendants" or "documented information from prisoners interviewed as potential suspects in the case."  (FAP 16, ECF No. 10.) Throop summarily concludes:  "The failures to disclose is prejudicial to petitioner because under the Totality of Circumstances in this case it was reasonably probable that had those materials been available during trial it would have been sufficient to undermine confidence in the outcome of the jury's verdict at issue."  (FAP 16, ECF No. 10.)  Respondent argues Throop's <u>Brady</u> claim should be rejected in its entirety as vague and conclusory.  (<u>Id.</u> at 22.)

In order to establish a constitutional violation on a claim of prosecutorial misconduct in the withholding of evidence, a claimant must satisfy the standards from <u>Brady v. Maryland</u>, 373 U.S. 83v(1963).  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," and the suppression must have prejudiced the defendant.  <u>Brady</u>, 373 U.S. at 87.  The duty to disclose favorable evidence "is applicable even though there has been no request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), and . . . the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985)." <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (parallel citations omitted).

"[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009); *see* <u>Strickler</u>, 527 U.S. at 280.  "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995) (The touchstone of materiality "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a

trial resulting in a verdict worthy of confidence"); *see* <u>Bagley</u>, 473 U.S. at 678. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." <u>Barker v. Fleming</u>, 423 F.3d 1085, 1099 (9th Cir. 2005) (citations omitted). "[U]nless the [suppression] deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's duty to disclose." <u>Agurs</u>, 427 U.S. at 108.

Concerning the photographs, Throop represents that Victor Parra, one of the multiple indicted inmates who was tried separately from Throop on other charges arising from the November 2003 prison riot, was represented by Brooks Anderholdt, a partner in the same law firm as his own defense attorney. Those attorneys employed the same private investigator, George Wallet. Throop represents that "[d]uring Spring 2005, Mr. Anderholdt received videotapes and approximately 200+ photos as part of Parra's requested discovery," which he describes as "completed sets of discovery films," and that his trial court "initially ordered these two attorneys to utilize (share) that single set of (Parra's) discovery," as "described in Ground 5 below." (FAP 14, ECF No. 10.) Throop claims that investigator Wallet "arranged a viewing of Parra's films with petitioner" in September 2005. (<u>Id.</u>) He represents that "in several 35mm photographs, [he, Throop] is depicted" in a seated position "more than 100 feet away from . . . the location of the alleged offenses occurred." (<u>Id.</u> at 14-15.) He also contends that one of the ISU videos shows him "relinquishing his personal clothing" to officers and having the items "tagged and bagged as evidence alongside other inmate's clothing." (<u>Id.</u> at 14.)

Throop represents "on information and belief" that the Parra trial began in September 2005, months before his own May 2006 trial, and that the photographs investigator Wallet possessed were "entered into evidence at that trial." (FAP 15, ECF No. 10.) He alleges that "an oversight prevented copies of those pictures taken by [CO]

Alvarez being provided to" his defense counsel, who "was never able to inspect them and had no knowledge of them until petitioner explained their relevance in May 2006." (Id.) His defense attorney "[a]pparently . . . requested a second set of photos from the DA after discovering that the Parra discovery had become unavailable," but that at the readiness conference before his trial Throop "alerted [his attorney] that this second batch contained less than half of the earlier stack issued" for the Parra trial. (Id.) He also asserts that he "personally complained to [his] trial [judge] about it," because that circumstance purportedly "was evidence that ISU had doctored the photo log to delete" images favorable to him. (Id.)

Respondent argues that Throop fails to support his contentions of withheld evidence with any affidavit or declaration from his trial counsel. The record reveals that at the May 16, 2006 motions in limine hearing, Throop addressed the court regarding his concerns that "a group of photographs" he was shown the day before "are not the same photographs that I seen six months ago with the investigator." (Lodg. No. 3, RT vol. 7 at 199.) In particular, Throop represented he could not now locate "three to five" pictures of inmates he had seen before which "were close-up photographs, like a portrait of these men in these areas," and a particular "photograph of the scene." (Id. at 200-201.) Defense counsel acknowledged that Throop had expressed those concerns to him, that he had compared the photographs in his file to each picture in the prosecutor's file and all were accounted for. (Id. at 200). Counsel stated he would talk to the investigator about the ostensibly missing photographs. (Id.) Counsel added that there was also "a question as to the photographic logs, but that's been explained by Officer Critenon [sic]." (Id.) Respondent observes that "there is nothing in this record to indicate that [defense counsel] was prevented from viewing or obtaining copies, during or after Parra's" September 2005 trial, "if counsel thought them material." (Answer 21-22, ECF No. 21-1.)

Throop urges this Court to engage in a frame-by-frame analysis of particular photos he contends are "favorable to petitioner's defense" to establish the legitimacy of

his claim.[10]   (Id.)  Leaving aside the impropriety of such a proposed undertaking on federal habeas review, the Court notes that even though Throop wants the Court to impute a Brady violation to the prosecution on the ground of a purportedly incomplete production of photographs intentionally "withheld," Throop simultaneously acknowledges that the discrepancy appears to have been the result of an "oversight." (Id.) By Throop's own account, the prosecution had in fact already produced a complete set of the relevant photographs to his attorney's law partner who was representing inmate Parra at a separate trial.  The defense investigator actually showed them to Throop personally months before his trial.

Concerning his confiscated clothing, Throop states that he was unaware "until ISU delivered boxes of physical evidence to court" that had been "processed from the crime scene" that "none of his clothing had been included nor released to [his defense counsel] either," despite "the video show[ing] ISU collecting it."  (FAP 15, ECF No. 10.)  He posits, among other things, that if the clothing evidence had been made available to counsel in advance of trial, testing could have been conducted for "residue from chemical agents described by staff as doused onto all of the inmates in the vicinity" of the riot "to corroborate petitioner's defense that he was never affected by teargas because he was NOT in the area and had not handled any pepper-spray weapons."  (Id.)  His speculative, self-serving representation about what his clothes might have revealed is insufficient to satisfy any of the elements of a viable Brady claim.

This Court's function is confined to a determination whether the state courts reached an objectively reasonable result from the record, irrespective of other inferences or findings which might also be drawn.  The California Court of Appeal reasonably rejected his claim that the prosecution failed to disclose favorable evidence in its

---

[10]  Throop adds, "on information and belief," that certain photographs "which were filmed at the CAL infirmary, & Pioneers Memorial Hospital [citing exhibit numbers], are/were the same pictures distributed to the defense attorneys representing the dozen or more inmates indicted for that incident after petitioner" but were "NOT released" to him for his trial.  (FAP 15, ECF No. 10.)  He fails to establish how those could be construed as "exculpatory" or having impeachment value with respect to the pepper spray charges against him.

September 9, 2011 decision denying Throop habeas relief.  (Lodg. No. 16.)  Throop's ambiguous and speculative arguments fail to demonstrate that the prosecution "withheld" any evidence material to the determination of his guilt in the form of missing photographs, seized clothing, or any particular inmate interview, or any likelihood that "the result of the proceeding would have been different" had that material been produced before trial.  <u>Strickler</u>, 527 U.S. at 280; <i>cf.</i> <u>Smith</u>, 132 S.Ct. at 630 (finding, on direct review of a first-degree murder conviction, that the prosecution withheld a witness' "undisclosed statements" that were "plainly material" because that "was the <i>only</i> evidence linking [the defendant] to the crime").  No fewer than seven correctional officer percipient witnesses in the melee testified at his trial and identified him as an active participant in the pepper spraying incidents for which he was convicted.  "We have observed . . . that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."  <u>Smith v. Cain</u>, __ U.S. __, 132 S.Ct. 627, 630 (2012), <i>citing</i> <u>Agurs</u>, 427 U.S. at 112-13 and n. 21.  Throop has not shown a "reasonable probability" that the jury would have been persuaded by the allegedly undisclosed evidence, "in the context of the entire record." <u>Bagley</u>, 473 U.S. at 682; <u>Agurs</u>, 427 U.S. at 112. After independent consideration of the record, it is recommended the Court find no basis to disturb the state courts' rejection of this claim.

**4.    Prosecutorial Interference With Defense Witness Availability**

Throop repackages here as "interference" with witness availability his contentions regarding the circumstances of Garcia's acceptance of a plea deal and his consequent withdrawal from his anticipated joint trial with Throop, discussed in connection with his Ground One allegations of conspiracy and interference with compulsory process. He reiterates his suspicions that the plea deal was part of alleged collusive conduct among "agents of the prosecution" engaged in surreptitious conduct and tactics to learn his and his co-defendant's defense strategies.  (FAP 17, ECF No. 10.)  He characterizes this claim as another example of a "pattern" of government misconduct in his case

allegedly undertaken in order to gain "an unfair tactical advantage over the defense." (Id.)

Throop argues in particular that "the information gleaned from the government intrusions into their lawyer-client relationships had already alerted the prosecution that inmate Garcia was poised to testify as a witness for petitioner's defense once he was sentenced in accordance with the DA's offer that was accepted in the winter of 2005." (FAP 16, ECF No. 10.)   He represents that Garcia "renegged [sic] on the plea agreement" after he received his presentence report, "and resumed trial preparations for a joint trial with" Throop.  (Id.)  Throop then describes "on information and belief" a convoluted series of alleged promises and conduct by Garcia's public defender purportedly to further that attorney's pursuit of a position in the District Attorney's office, such as an agreement to propose a new plea deal to Garcia that instructed him "to refuse to testify on behalf of petitioner's defense" and "not to share any further information relating to this case with petitioner, nor his defense representatives."  (Id. at 16-17.)  Throop speculates that the "revised [plea] agreement [offered to Garcia] carried significant coercive force," and "intimidated" Garcia.  (FAP 17, ECF No. 10.)  Without a shred of supporting evidence, Throop concludes:  "As a result, he was instructed to invoke his Fifth Amendment rights until sentencing . . . which was held in abeyance until after the trial to guarantee that he would not cooperate as a defense witness under threat of revoking the deal."  (Id.)

Ignoring the codified limitations of federal habeas review of state court convictions, Throop argues this Court should grant him relief because "a preponderance of evidence demonstrates a strong suggestion that Garcia's decision not to testify was induced by the State's willful and deliberate misconduct," in supposed violation of Throop's "Fifth, Sixth and Fourteenth Amendments not to employ tactics that substantially interfere with an accused's right of access to a crucial witness in his defense." (FAP 17, ECF No. 10.)  Throop's assertion that the prosecution acted to "transform[] a willing witness into one who would refuse to testify" is predicated on his

fanciful notion that "[i]f not for the prosecution's persistent shenanigans petitioner would have been acquitted of the two remaining counts because the evidence was not over-whelming, and primarily circumstantial since the bulk of prosecution testimony pertained to spraying Alvarez, Leamons and Drennon, for which the acquittals for Counts 3, 4 and 5 proves never happened at all!" (Id.)  Even if all that Throop alleges with regard to the circumstances surrounding Garcia's absence as a witness at his trial were true, a proposition he fails entirely to substantiate, the record does not support the conclusion that absent Garcia's evidence, Throop did not receive a fair trial. *See* Strickler, 527 U.S. at 281; Kyles, 514 U.S. at 434.  If Garcia had testified that Throop had nothing to do with the batteries on correctional officers, at most a credibility question would have been before the jury, to weigh against the multiple eyewitnesses who identified Throop as a perpetrator.

As reasonably found by the superior court in denying Throop habeas relief  on the ground that he was allegedly deprived of Garcia's testimony due to prosecutorial and CDCR misconduct, "[h]is allegations are speculative and conclusory," and he fails to "demonstrate that the testimony of Garcia would have any effect on a jury given that some seven CO's testified as eyewitnesses to the batteries according to the court of appeal summary." (Lodg. No. 14, slip op. at 2.)  The state court of appeal subsequently reviewed  anew Throop's claim that he was purportedly deprived of his codefendant's "exonerating testimony" and thus a fair trial, and similarly found his speculative arguments were  inadequate to state a prima facie case for relief.  (Lodg. No. 18, slip op. at 1-2:  "There is no evidence of prosecutorial misconduct or an improper plea bargain.")  The Court should find that there is no basis for disturbing the state court result as Throop satisfies none of the AEDPA standards for federal habeas relief on this theory.  28 U.S.C. § 2254(a),(d).

**5.   <u>Inconsistent Prosecutorial Facts And Theories At Separate Trials</u>**

Throop alleges his Fifth Amendment rights were violated "because the state

proffered inconsistent prosecutorial theories and facts regarding the same charges at separate trials against his coindictees concerning elements of his involvement" in the riot during the prison yard melee which resulted in grand jury indictments "against a dozen or more state prisoners for battery."  (FAP 18, ECF No. 10 (typography modified).)  The court of appeal denied him relief on that or any of the other multiple challenges to his conviction presented in his second habeas petition to that court, on the merits and on procedural grounds.  (Lodg. Nos. 15, 16.)

In reliance on Ninth Circuit authority, for apparent want of controlling United States Supreme Court authority, with Throop conceding "the Supreme Court has yet to consider this issue" (Traverse 45, ECF No. 39), Respondent articulates the Ninth Circuit's approach to the constitutionality of inconsistent theories taken by a prosecutor in separate trials, which Throop adopts in his Traverse.

> The Supreme Court has held that prosecutors violate a defendant's right to due process if they knowingly use false evidence. *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935); *Berger v. United States*, 295 U.S. 78, 84-89 (1935). It follows that a prosecutor's pursuit of fundamentally inconsistent theories in separate trials against separate defendants charged with the same murder can violate due process if the prosecutor knowingly uses false evidence or acts in bad faith.

Nguyen v. Lindsey, 232 F.3d 1236, 1240 (9th Cir. 2000).

Leaving aside the AEDPA restriction that the absence of a United States Supreme Court holding on the issue presented precludes habeas relief under 28 U.S.C. § 2254(d)(1), Carey, 549 U.S. at 77, Throop's reliance on Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997), *rev'd on other grounds,* 523 U.S. 538 (1998), in support of this argument is misplaced.  The Thompson court found that the prosecutor violated that defendant's due process and fair trial rights by pursuing "glaring inconsistencies" in his theories, arguments, and factual representations in separate trials of two defendants charged with the same murder.  That prosecutor made "patently untrue statements" to the jury about the lack of motivation for the testifying jailhouse informants to lie, temporar[ily] abandon[ed] during Thompson's trial . . . the theory he presented, and supported with evidence, at the preliminary hearing, in the pretrial motions, and again

at and after [his co-defendant's] trial," and "essentially ridiculed the theory he had used to obtain a conviction and death sentence at Thompson's trial"). Id. at 1055-56, 1057-58. In Throop's case, he identifies no particular "patently untrue" statement or fundamentally inconsistent, mutually-negating theory advanced by the prosecution in any particular separate trial arising from the same crimes for which he was tried. As Respondent observes, "Throop does not assert and produces no evidence that the prosecutor argued at a trial of a different inmate *charged with the same crime*, that is, the pepper-spray assault on Morales and Johnson, that anyone other than Throop was guilty." (Answer 23, ECF No. 21-1.) It appears that only Throop and his co-defendant Garcia were charged with those particular batteries. Moreover, the United States Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." Bradshaw v. Stumpf, 545 U.S. 175, 190 (2005) (Thomas, J., concurring); *see* Nguyen, 232 F.3d at 1240 (recognizing that a prosecutor's presentation of even fundamentally inconsistent theories of guilt against co-perpetrators who are tried separately is not a per se constitutional violation). Throop satisfies none of the AEDPA standards required before federal habeas relief is warranted on this theory.

### 6.    Conviction Based On False Testimony

Throop alleges that prosecution witness Lieutenant Hunt falsely testified, for the first time at his trial, that Officers Burkhammer and Silva "had lost their pepper spray when they fell to the ground" during the melee. (FAP 19, ECF No. 10, citing 10 RT at 421.) Throop characterizes Hunt's testimony as a purported effort "to fill the voids in the prosecution theory that could not positively explain why no single prison guard under his command submitted reports about losing their state issued MK-9 equipment, nor did anyone recover or collect any MK-9s from an inmate or on the ground," whereas "State regulations mandate that supervisors be immediately notified of any weapons lost by staff -- or intercepted by prisoners." (Id.) After a detailed summary of his own interpretation of the evidence, Throop concludes: "The prosecution clearly

acquiesced Hunt's [sic] deception of the court by failing to correct his misleading testimony," a purported violation of the constitutional standards from <u>Napue v. Illinois</u>, 360 U.S. 264 (1959) and <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935).

"A conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," whether through the prosecutor's solicitation of such evidence or through allowing it "to go uncorrected when it appears." <u>Napue</u>, 360 U.S. at 269, *citing, inter alia*, <u>Mooney</u>, 294 U.S. 103. On federal habeas review of <u>Napue</u> errors, the harmlessness standard "is different from the ordinary harmlessness standard, and is referred to in *Napue* and its progeny as a 'materiality' standard." <u>Dow v. Virga</u>, 729 F.3d 1041, 1043, 1048 (9th Cir. 2013) ("a presentation to a fact-finder of false testimony knowing it to be false" requires "reversal of a conviction if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury' "), *quoting* <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972), *quoting* <u>Napue</u>, 360 U.S. at 271.

The state court record amply supports the immateriality, for purposes of undermining officer Hunt's testimony, of an absence in incident reports by correctional officers involved in the riot of statements that they lost their MK-9 pepper spray equipment. As reasonably found by the court of appeal on direct review, irrespective of whose particular MK-9 pepper spray canister or canisters were used to spray the correctional officers or how the canister he used came into Throop's possession, several testifying witnesses, including Morales and Johnson, the two victims he was convicted of spraying, positively identified him. No reasonable factfinder could conclude that Hunt's purportedly "misleading" statement constituted "false evidence" "uncorrected" by the prosecutor that probably affected the judgment of the jury.

### 7.    <u>Impermissibly Suggestive Identification Procedures</u>

Throop speculates that he was identified by correctional officers as a participant in the riot as part of their effort to "scapegoat" prisoners out of "embarrassment" for having relinquished control over their pepper spray equipment, whereas the pepper

spray "exposure [was] actually attribut[able] to errant friendly fire from a coworker." (FAP 21, ECF No. 10.)  He argues the eyewitness testimony at his trial was "tainted by unnecessary underground suggestive identification practices employed by CDCR/CAL." (Id.)  He recites as a purported example of that claim, among others of the same ilk, that  "every prosecution witness acknowledged preparing their report drafts while collaborating with other guards . . . referring to 'laundry lists' of inmate names."  (Id.)  He argues from that procedure that  "circumstantial evidence of the high[] suggestiveness of the investigative agency's out of court identification procedure . . . was conducive to COACHING petitioner's inculpation."  (Id.)

Urging this Court to characterize the eyewitness identification testimony against him as "incredible, or patently unbelievable," and to disregard it all on that basis, he vaguely argues "the court should consider the entire process of the prosecuting agency's clearly inadmissible methods of suggesting identifications along with confusing conditions at the scene" as "[c]ircumstantial evidence of the questionable origins of recklessly discharged pepper spray streams." (FAP 21-22, ECF No. 10.)  He contends that the three acquittals in his case, involving officers Leamons, Alvarez, and Drennon, warrant exclusion in its entirety of their testimony, as well as the testimony of "the relevant prosecution witnesses who corroborated those 3 guards' version" of events on grounds those verdicts purportedly prove it did "NOT . . . happen[] at all." (Id. at 22.)

Rather characteristically of Throop's briefing, it is only in his Traverse that Throop cites any authority in support of his "impermissibly suggestive witness identification" due process claim. (Traverse 48-51. ECF No. 39.)  None of it supports his position.  For example, in Stovall v. Denno, 388 U.S. 293 (1967), *overruling on other grounds recognized in* Griffith v. Kentucky, 479 U.S. 314 (1987), the Court applied the exclusionary rule that a finding of a due process violation in the context of a tainted confrontation for identification purposes depends on the totality of the circumstances surrounding it, because the rules are aimed to avoid confrontations that are "so unnecessarily suggestive and conducive to irreparable mistaken identification"

as to deny the accused due process.  <u>Stovall</u>, 388 U.S. at 301-302 (finding no due process violation when the defendant was brought to the hospital room of a stabbing victim for purposes of identification).  Similarly, the Court in <u>Neil v. Biggers</u>, 409 U.S. 188 (1972) applied the totality of the circumstances standard to hold that an arguably suggestive station-house identification of a suspect by a rape victim was nonetheless reliable and was properly allowed to go to the jury.  In Throop's case, no reasonable determination that a risk of "irreparable mistaken identification" due to "unnecessarily suggestive" identification procedures is conceivable.  The testifying correctional officer witnesses were employed at Calipatria where Throop was incarcerated, and most were personally acquainted with him before the incident through their interactions with inmates in the course of their employment.  In those circumstances, none of his complaints about the investigational process through which he was identified by them to be a perpetrator can reasonably be construed as entailing an "unnecessarily suggestive" process that undermines the reliability of the identifications or, consequently, of his convictions.

This claim is patently meritless.  Cutting through Throop's hyperbolic speculation, rejecting his distinguishable authority, and disregarding the inapplicable standards of review he invokes, his arguments do not undermine the objective reasonableness of the state court's result.  His contention that the "tainted" pretrial identification procedures rendered the eyewitness evidence unreliable is particularly unpersuasive because he admits the jury was made aware of the identification procedures during his trial:  "the totality of these facts were uncovered only by questioning at the trial, and essentially surprised the defense."  (FAP 22, ECF No. 10.) A federal habeas court does not reweigh the evidence nor substitute its own assessment of the evidence for that of the fact finder.  This Court should decline Throop's sweeping invitation to "exert its power to upset flawed jury credibility determinations" and to "reject the 'suggestive identification evidence' " he summarily purports to have "shown to be contrary to law, or so improbable on it face that no reasonable fact-finder could

accept it . . . because under all the circumstances [a] 'substantial likelihood of irreparable misidentification' is EVIDENT."  (Traverse 51, ECF No. 39, *quoting* Biggers, 409 U.S. at 198.)

### 8.   Shackled Escorts Viewed By Jurors

Throop alleges: "Petitioner's right to due process and a fair trial . . . was violated because the prosecuting agency deliberately subjected him to daily nonroutine escorts in shackles viewed by jurors to circumvent pretrial orders to remove his handcuffs in their presence." (FAP 22, ECF No. 10.) He challenges this purported component of his Ground Four "CDC's pattern of misconduct" contending that as "agents of the judicial system," they "contrived conditions for manipulating and exploiting their control over his court appearances." (Id. (typography modified).)

On May 17, 2006, the day before voir dire began, the court and counsel discussed the use of physical  restraints in the courtroom.  Everyone agreed visible restraints would not be permissible, but that the nature of the case and legitimate security concerns on the part of the CDC made some form of courtroom restraint desirable. (Lodg. No. 3, RT vol. 7 at 185-189.)  The court identified as the "main problem" to be addressed was to keep the defendants "away from weapons," not merely to "protect from flight," and intentionally placed on the record the security challenges at the courthouse in support of her ruling that the defendants should at least wear leg braces:

> [T]his courthouse has four doors in which people enter.  And there is no security at any of those doors.  There's no camera.  There is no metal detector.  There are no lock boxes for weapons.  There is no guard at any of these doors.  They're open all day long from 8:00 in the morning until about 6:00. . . .

(Lodg. No. 3, RT vol. 7 at 210-211.)

The court stated its expectation that the defendants they would not "be wearing handcuffs or any other chains or visible shackles." (Lodg. No. 3, RT vol. 7 at 208; *see* Lodg. No. 1, CT vol. 2 at 0513, ordering that Throop be "unshackled but wearing a leg brace and clothed in street clothes during the trial" at "any and all court appearances made by the inmate after May 16, 2006. . . ."). The court had a "brown cloth put around

the table" in the courtroom so the defendants' feet could not be seen.    The next day, before voir dire began, the custody captain from Calipatria and the prison's litigation coordinator appeared along with the defendants and counsel to further discuss the restraints issue.  The captain explained that the prisoners would be in leg iron shackles when they arrived for court "per our policy," with a heavy metal plate secreted underneath the table for securing the leg iron chain.  (Lodg. No. 3, RT vol. 8 at 276-279.)  He explained that defendants would come to the table in full irons on their legs and ankles "like you see now," and acknowledged it would be "noticeable that they're walking with something heavy attached to their feet".  (Id. at 279.)  Defense counsel argued that the irons' chain and metal plate would prevent the defendants from standing and could be heard by the jury.  Counsel requested that "if my client chooses to testify," counsel requested that a leg brace replace the irons for that period.  (Id. at 280-281.) The captain responded that a "brace is not part of the [CDCR's] equipment that we are authorized to utilize," and "while these gentlemen are in our charge, that's not a device that we can use to secure them."  (Id. at 281.)  The court permitted the metal plate with a hook to restrain the defendants' legs under the table, until such time as the testimony issue might arise.  (Id. at 283-284; *see* Lodg. No. 1, CT vol. 2 at 528.)

Throop alleges that thereafter, his transportation teams began "deviating from" the practice that had been customary for his pretrial hearing appearances, when he arrived an hour early, restrained in waist and leg chains, but accessed the courthouse through prisoners' entrances located in an alleyway at the rear of the building.  He alleges they stopped using the "less intrusive entrances designated for prisoner escort routes" to court and began instead, "halfway through voir dire and for the duration of the trial," to keep him in the vehicle "until the moment that his jurors began arriving and entering through the court's East wing public entrance, at which time the backdoor passages were bypassed so that they could parade petitioner in chains around the building's driveway and into the same civilian path known to be favored by jurors #3, #4, #5, and #11."  (FAP 23, ECF No. 10.)  He contends "this suspicious arrangement"

1    led to "inappropriate encounters at the doorway staircase between jurors and petitioner

2    -- in full restraints with armed uniformed escorts, multiple times per week." (Id.)

3        Throop attributes those procedures as intended "to coercively suggest he was a

4    violent person predisposed to commit crimes of the type alleged" predicated on a

5    "pretext of justifiable or reasonable need." (FAP 23, ECF No. 10.) He contends that

6    "the synchronicity of those stages 'perp-walks' " provides additional "[c]ircumstantial

7    evidence of the on-going tag team chicanery between ISU and prosecutors. . . ." Id.)

8    He represents that the court "reproached deputies and guards to exercise caution"

9    following "the first instance of shackle exposure on May 18, 2006," yet another such

10   encounter recurred in the hallway, purportedly causing defense counsel to express

11   "dismay[] over the futility of redundantly addressing an obvious network of collusion

12   between government actors." (Id.) He argues that the "resulting prejudice from these

13   machinations became apparent when [J]uror #3 was later seen in the jury box physically

14   demonstrating for Juror #4  the methods for securing prisoners' wrists to waist-chains

15   that she became familiar with seeing." (Id.) He concludes from those allegations that

16   "it is reasonably probable that those nonroutine security measures amounted to

17   deliberate jury embracery that impaired the fairness of petitioner's trial . . . ." (Id.)

18       The Constitution forbids the use of visible restraints during a criminal trial

19   "*unless* that use is 'justified by an essential state interest' -- such as the interest in

20   courtroom security -- specific to the defendant on trial." Deck v. Missouri, 544 U.S.

21   622, 624 (2005) (emphasis in original). The Fifth and Fourteenth Amendments permit

22   a trial court to determine, in the exercise of its discretion, that restraints visible to the

23   jury are justified by a state interest specific to a particular trial, in consideration of such

24   traditional factors as potential security problems and the risk of escape. Id. at 629; *see*

25   Wilson v. McCarthy, 770 F.2d 1482, 1484 (9th Cir.1985) ("The trial court has

26   discretion to use shackles or other security measures when circumstances dictate").

27   Ordinarily, only the shackling of a defendant in the courtroom during trial when the trial

28   court prejudicially failed to comply with established safeguards to ensure that only the

least restrictive alternatives are used in response to a compelling need concerns federal habeas courts. *See* Dyas v. Poole, 317 F.3d 934, 937 (9th Cir. 2003) (per curiam) (finding prejudice from a concededly unconstitutional shackling of the defendant during her trial where the record was devoid of evidence that the trial court made attempts to conceal the defendant's restraints in the courtroom during the trial); *see also* Spain v. Rushen, 883 F.2d 712, 715 (9th Cir. 1989) (finding a due process violation when the trial judge failed to considered the less restrictive means of exclusion from trial before imposing on the defendant shackling of "unparalled" extent and duration); Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir.1999) (finding a defendant was prejudiced because the jury saw him shackled throughout the entire trial).

The safe transport of prisoners and the manner of transport from prison to court are the responsibility of the institutional custodian. The Ninth Circuit has consistently held that a juror's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom does not raise a constitutional concern warranting habeas relief. *See, e.g.,* Ghent v. Woodford, 279 F.3d 1121, 1133 (9th Cir. 2002) (Brief or inadvertent glimpses "of a shackled defendant is not inherently or presumptively prejudicial"); *see also* Castillo v. Stainer, 983 F.2d 145, 147-48 (9th Cir. 1992) (finding no due process violation when some members of the jury pool saw the defendant in shackles in a court corridor, and that although the court committed constitutional error by permitting shackling during trial without weighing that burden against less restrictive alternative, the error was harmless).

In his Traverse, Throop clarifies that this complaint targets the conduct of his custodians rather than the trial court: "[B]ecause petitioner was housed in the custody of the same victims and crime scene investigators involved in his prosecution, they were enabled to abuse their discretion in a concerted strategy to prejudice petitioner's jury panel by 'staging' daily 'perp-walks' disguised as routine security practices that 'displayed to the world against his will, in handcuffs, and in a posture connoting guilt.' " (Traverse 52, ECF No. 39, *quoting* Lauro v. Charles, 219 F.3d 202, 212 n.7 (2d Cir.

2000), an inapposite Second Circuit civil rights case brought by an arrestee pursuant to 42 U.S.C. § 1983 challenging such conduct under the Fourth Amendment.) Respondent argues that Throop's complaint "that he was transported from the prison to the courthouse in shackles and that some jurors saw him" is not contrary to any "United States Supreme Court holding that prohibits the shackling of defendants during transport to the courthouse," and therefore "the state court's denial of this claim cannot have been unreasonable." (Answer 25, ECF No. 21-1, *citing* <u>Moses</u>, 555 F.3d 760.)

The record here demonstrates that Throop's trial judge reasonably exercised her discretion to accommodate the competing interests of security and protection against unnecessarily suggestive restraints. The issue was discussed among court and counsel, and precautions were taken to conceal his restraints in the courtroom. As emphasized in <u>Deck</u>, the most important indicator of prejudice in this context is the visibility of restraints to the jury during trial. <u>Deck</u>, 544 U.S. at 624. Throop does not challenge the manner, visibility, or degree of restraint used in the courtroom during the course of the trial proceedings.

Even if Throop could establish a violation of his due process rights in this regard, "[s]hackling, except in extreme forms, is susceptible to harmless error analysis." <u>Duckett v. Godinea</u>, 67 F.3d 734, 749 (9th Cir. 1995); *see, e.g.*, <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1064 (9th Cir. 2008) (finding that the petitioner failed to show that "wearing the leg brace for the first two days of a six-day trial" satisfied the <u>Brecht</u> standard). Throop fails to establish prejudice from his contentions that some jurors caught glimpses of him in transit to the courtroom wearing restraints. The jurors obviously knew by the nature of the charged crimes that Throop was already incarcerated at the time of the prison riot. Moreover, the trial evidence against him was substantial. *See* <u>Cox v. Ayers</u>, 613 F.3d 883, 891 (9th Cir. 2010) ("we have held that the unconstitutional shackling of a defendant results in prejudice only of the evidence of guilt is not 'overwhelming' ") (citation omitted). It is recommended the Court find the state courts reasonably denied Throop relief on this theory, as he demonstrates

1    neither a constitutional violation nor prejudice associated with his shackling claim.

2              **9.      No Constitutional Errors To Cumulate**

3         The Ninth Circuit recognizes that the combined effect of discrete trial errors can

4    sometimes warrant federal habeas relief, even when none of them individually does.

5    *See* Parle v. Runnels, 505 F.3d 922, 927 (9th   Cir. 2007), *citing* Chambers v.

6    Mississippi, 410 U.S. 284,] at 298, 290 n. 3, 302-03 (1973); *see also* Alcala v.

7    Woodford, 334 F.3d 862, 882-83 (9th Cir. 2003) (finding that the combined prejudice

8    of multiple errors deprived the defendant "of a fundamentally fair trial and constitute[d]

9    a separate and independent basis for granting his petition").   However, a cumulative

10   prejudice claim necessarily presupposes that the Court will find that substantial error

11   occurred in connection with at least two claims. *See* Hayes v. Ayers, 632 F.3d 500, 524

12   (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude

13   occurred, no cumulative prejudice is possible").   As it is recommended the Court find

14   "no single constitutional error" occurred under any of Throop's Ground Four claims,

15   "there is nothing to accumulate to a level of a constitutional violation."   Mancuso v.

16   Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).   Ground Four should be **DENIED** in its

17   entirety.

18         **F.      Ground Five:  Ineffective Assistance Of Counsel ("IAC")**

19        Throop challenges the constitutional adequacy of his representation by trial and

20   appellate counsel in several particulars, under the heading:   " 'Surrounding

21   Circumstances' Impaired Trial And Appellate Counsel's Abilities To Provide Effective

22   Representation In Accordance With The Sixth And Fourteenth Amendments To The

23   U.S. Constitution."  (FAP 24, ECF No. 10).   Concerning his trial attorney, Thomas

24   Storey, he alleges:  (a) counsel was "actively influenced by diverse conflicts of interest

25   that adversely affected his performance and adequacy of representation"; (b) deliberate

26   state interference denied him effective assistance of counsel; (c) "the cumulative impact

27   of the surrounding circumstances" contributed to "deficiencies & inactions of trial

28   counsel during critical stages"; and (d) IAC for failure to request that Juror No. 2 be

removed for cause "after the trial court's procedures impaired the exercise of peremptory challenges." (Id. 24-28.)  He also alludes to his Ground Four claim that the sharing of the photographic evidence by his attorney and Victor Parra's attorney, partners in the same law firm, as initially instructed by the trial court, entailed IAC.  The latter claim is addressed above in connection with Ground Four.  (FAP 14, ECF No. 10.)  Concerning his appellate attorney, Robert E. Boyce, Throop alleges IAC for failure to exhaust or brief viable issues and failure to ensure the transcript was accurate.  (Id. at 28-29.)

### 1.    Legal Standards

To prevail on an IAC claim as a Sixth Amendment violation, a petitioner must demonstrate that his or her attorney's unprofessional errors were so serious as to deprive the defendant of the counsel guaranteed by the Sixth Amendment, and that the deficient performance prejudiced the outcome of the trial.  Strickland v. Washington, 466 U.S. 668, 687 (1984) (The claimant must show both (1) deficient performance under an objective standard of reasonableness and (2) prejudice).  To demonstrate deficient performance, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " Richter, 131 S.Ct. at 787, quoting Strickland, 466 U.S. at 687, 689.  To demonstrate prejudice, the petitioner must show that "but for counsel's unprofessional errors," there is a reasonable probability "the result of the proceeding would have been different." Strickland. 466 U.S. at 690, 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome"); see Richter, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable").  "Because failure to meet either [Strickland]  prong is fatal to [an IAC] claim, there is no requirement that we 'address both components of the inquiry if the defendant makes an insufficient showing on one.' " Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011), quoting Strickland, 466 U.S. at 697.  "Without proof of both deficient performance and prejudice to the defense . . . the sentence or conviction should stand." Bell v. Cone,

535 U.S. 685, 695 (2002) (citation omitted).

The Strickland performance and prejudice standards govern the resolution of IAC challenges to the representation of appellate counsel as well as trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000).   Reviewing courts must apply a "strong presumption" that "counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." Richter, 131 S. Ct. at 785.  A state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough, 541 U.S. at 664.  "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied *Strickland* incorrectly." Bell, 535 U.S. at 699.  Federal habeas courts must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," not "whether counsel's actions were unreasonable." Richter, 131 S.Ct. at 785, 788.  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 131 S.Ct. at 786; *see* Burt v. Titlow, __ U.S. __, 134 S.Ct. 10, 13 (2013) (discussing the "double deference" federal habeas courts must apply to IAC claims and reversing a Sixth Circuit court for failure to apply that standard in "refusing to credit a state courts' reasonable factual finding and by assuming that counsel was ineffective when the record was silent").

Relief on IAC grounds can also be warranted when "the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial." United States v. Cronic, 466 U.S. 648, 661 (1984), *citing* Powell v. Alabama, 287 U.S. 45 (1932).  Such circumstances may be found, for example, from the denial of the presence of counsel at critical stages of a prosecution or when an actual breakdown in the adversarial process justifies the application of a presumption that the defendant's conviction "was insufficiently reliable to satisfy the Constitution." Id. at

662.

## 2. **Trial Counsel Challenges**

Of the claims Throop raises under a theory of trial counsel IAC, only his allegations that counsel purportedly had a conflict of interest because his law partner represented another inmate in a separate trial arising from the prison riot, that he was distracted by his own representation of an inmate also housed at Calipatria who was facing capital murder charges in an unrelated matter, and that he was ineffective for failing to have Juror No. 2 removed from the jury involve conduct attributable to his attorney's own conduct.

Throop's contentions that "deliberate state interference denied petitioner effective assistance of counsel" protected by the Sixth Amendment and that "the cumulative impact of the surrounding circumstances" contributed to "deficiencies & inactions of trial counsel during critical stages" (FAP 25, 27, ECF No. 10 (typography altered) comprise allegations that conduct by others impaired his defense. The particular circumstances extraneous to counsel's own performance that Throop relies on in support of this claim are addressed and disposed of in connection with Ground Four. Throop's speculative allegations fall short of demonstrating "that counsel failed to function in any meaningful sense as the Government's adversary," Cronic, 466 U.S. at 666, due to any such extreme breakdown or third party obstructionism. New suggestions in his Traverse elaborating other general criticisms of his attorney need not be separately considered.

Throop relies on Campbell v. Rice 408 F.3d 1166, 1170 (9th Cir. 2005), a case presenting distinguishable facts, for the proposition that defendants are entitled to "representation that is free from conflicts of interest." (Traverse 54, ECF No. 39.) He faults the trial court for failure to inquire into the possibility that his defense attorney might be unable to effectively advocate for Throop because his law partner was defending another inmate in a separate trial on separate charges arising out of the same prison riot. (FAP 24-25, ECF No. 10.) He speculates that another of counsel's cases,

unrelated to his own or to the incident giving rise to the charges against him "restrained [counsel's] assertiveness with CDCR/ISU."  (Id.)  "Although a petitioner who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief, Mickens v. Taylor, 535 U.S. 162, 171 (2001) (emphasis omitted), Throop demonstrates no actual conflict of interest existed or affected the adequacy of his representation.  See Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) ("[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance").  Reviewing courts "cannot presume the possibility for conflict has resulted in ineffective assistance of counsel."  Id.  As noted by Respondent, "[e]ven where the same attorney represents two co-defendants in the same trial, 'trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.' "  (Answer 29, ECF No. 21-1, *quoting* Cuyler, 446 U.S. at 347.)  Throop fails to establish any factual basis to support his claim any conflict of interest deprived him of the effective assistance of trial counsel.

Throop's allegation of IAC for failure to excuse Juror No. 2 for cause fails for the same reasons as discussed in connection with the Ground Two challenge to the retention of that juror.   Concerning the IAC component of that claim, a portion of the discussion among court and counsel at the conclusion of the colloquy with Juror No. 2 summarizes the considered conclusions reached by the trial court and counsel on that juror's fitness to remain on the jury:

> [THE PROSECUTOR]:  It's really up to the defense.  If it's an issue for anybody that he's related to the D.A., continuing would be for them.  So I'll leave it up to them.
>
> [DEFENSE COUNSEL]:  He says he can be fair.  I don't think that's cause.  It would  be a preempt if I had one.
>
> THE COURT:  Yeah.  It didn't seem to be cause.  If he doesn't -- if he didn't remember he's related to the D.A. until now, it just doesn't seem like they're that close. So we're -- I guess we'll go on with him.

(Lodg. No. 10, slip. op. at 13.)

12cv1870

The court of appeal on direct review reasonably rejected this ground for relief.

> Based on our conclusions *ante* upholding the trial court's ruling that Juror No. 2 was competent to continue on the jury, that he did not engage in misconduct by his inadvertent failure to disclose that he and the Riverside district attorney were cousins and that Throop was not prejudiced even if we assumed juror misconduct, we conclude that counsel's performance did not fall below an objective standard of reasonableness. We further conclude that Throop, in any event, cannot show a reasonable probability that, but for counsel's (alleged) unprofessional errors, the outcome of the proceeding would have been different. [¶] . . . [W]e conclude Throop was not deprived of the effective assistance of counsel when trial counsel did not move to excuse Juror No. 2.

(Lodg. No. 10, slip op. at 20 & n. 12 (adding additional grounds for rejecting the claim based on state law authority affecting the exercise of peremptory challenges.)

According the requisite "double deference" to state court resolutions of IAC claims, *see, e.g.*, Burt, 134 S.Ct. at 13, it is recommended the Court not disturb the state court's objectively reasonable rejection of Throop's challenges to the constitutionality of his trial counsel's representation. Richter, 131 S.Ct. at 785-86.

### 3.   **Appellate Counsel Challenges**

Throop alleges he was "deprived of a meaningful and effective direct appeal" due to counsel's allegedly ineffective assistance in purportedly failing to exhaust or brief "viable issues" and for failing "to ensure that the transcript is accurate." (FAP 28, ECF 10.) In the latter regard, he identifies "2005 pretrial hearings" as not part of the transcribed record. He summarily characterizes those hearings as "essential to supporting the contentions that Judge Cota knowingly forced [trial counsel] to labor under a conflict of interest that included sharing discovery with two other attorneys, thereby causing discovery to become withheld from petitioner's trial." (Id. at 29.) Throop vaguely summarizes: "Thus, the surrounding circumstances of [appellate counsel's] representation prevented him from acting as an effective advocate for direct appeal. . . ." (Id.) The contentions he alleges could be supported by the missing hearing transcripts, even if true, are disposed of above in connection with Grounds Three and Four as providing no basis for federal habeas relief.

Appellate counsel need not raise every possible issue, no matter how remote, in order to avoid an IAC determination. *See* Jones v. Barnes,, 463 U.S. 745, 752 (1983); *see also* Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002). A petitioner is "not prejudiced by appellate counsel's decision not to raise issues that had no merit." Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991). In addition, where "trial counsel's performance, although not error-free, did not fall below the Strickland standard," no IAC can be ascribed to appellate counsel for failure to argue the petitioner's conviction should be overturned because of trial counsel's purportedly ineffective assistance. Id.

Respondent contends appellate counsel was not required to raise Throop's false-evidence and inconsistent-theories claims, arguing "the claims would not have been successful on appeal," foreclosing a finding of prejudice from counsel's purportedly deficient performance in that regard. (Answer 33, ECF No. 21-1.) Those theories are addressed above in connection with Ground Four, with the recommendation that they be rejected as meritless. Throop cannot demonstrate prejudice from counsel's decision not to raise meritless claims on appeal. Featherstone, 948 F.2d at 1507. As Respondent further notes, "there is no authority for the proposition that [appellate counsel] had a duty to search the record of other trials looking for issues." (Id.)

Similarly, Throop fails to demonstrate prejudice from his complaints about an incomplete record. He represents his preparation of post-conviction claims was "complicated" or "impeded," but he managed to file a comprehensive FAP and multiple state petitions without a transcribed record of proceedings from 2005. Respondent inventories minutes from the lodged Clerk's Transcript (Lodg. No. 1) for the period between February and April 2005 that Throop complains of, then accurately observes: "Throop fails to assert how these un-transcribed proceedings were material to his defense or to his appeal." (Answer 34, ECF No. 21-1.) For example, Throop's own pleading establishes that his "shackling complaint . . . did not become an issue until a year later, after a May 17, 2006 hearing" (id, *citing* FAP at 23, 29), and untranscribed

pre-trial proceedings similarly would not "have affected his ability to raise a *sentencing issue*" (id., *citing* FAP at 29).  Throop fails to demonstrate prejudicial IAC of his appellate counsel in any of the regards he identifies.

It is recommended the Court apply the "double deference" required by AEDPA in its review of all Throop's IAC claims, Burt, 134 S.Ct. at 13, Richter, 131 S.Ct. at 785-86, to conclude the state court's rejection of this ground for relief comports with controlling United States Supreme Court authority and is objectively reasonable, and **DENY** relief on Ground Five.

### G.   Ground Six:  Insufficient Evidence

Throop  argues his conviction was based on less than proof beyond a reasonable doubt of "each essential element . . . necessary to substantiate the subject offense," so that he was "denied his right to have the sufficiency of the evidence independently reviewed by the trial and appellate court . . . ." (FAP 30, ECF No. 10.)  Relying on materials outside the trial record and on his speculative arguments, Throop attempts to bypass the applicable standards of review controlling a substantive sufficiency of the evidence claim as well as the permissible scope of federal habeas review prescribed by AEDPA. In his Traverse, he suggests this Court should "disregard evidence it finds to [be] incredible, implausible, or contrary to law" and reach its own conclusions, irrespective of the jury's and the state courts' findings, and he sweepingly "reiterates that he is actually innocent," urging the Court to reexamine the entire record in consideration of each of his arguments purportedly "demonstrating that Respondent's claim of overwhelming evidence is without merit."  (Traverse 57, ECF No. 39.)

"As a matter of federal constitutional law, 'the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), *quoting* In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).  If the facts support conflicting inferences, the reviewing federal court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution" and must "defer to that resolution." Id. at 319, 324, 326 (the fact-finder alone is charged with determining the credibility of witnesses, resolving evidentiary conflicts, and drawing reasonable inferences from proven facts).  "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Coleman v. Johnson, __ U.S. __, 132 S.Ct. 2060, 2062 (2012) (per curiam), *quoting* Cavazos v. Smith, 565 U.S. __, 132 S.Ct. 2, 4,(2011) (per curiam) ("it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial").

Federal habeas courts reviewing state court convictions do not reweigh the evidence or make credibility determinations. All conflicting factual inferences must be resolved in favor of the prosecution. Juan H, 408 F.3d at 1266 n.1, *citing* Jackson, 443 U.S. at 319.  After AEDPA, a constitutional challenge to the sufficiency of the evidence to support a conviction is controlled by the clearly established principles enunciated in Jackson, 443 U.S. 307, applied "with an additional layer of deference." Id. at 1274; *see also* Parker v. Matthews, __ U.S. __, 132 S.Ct. 2148, 2152 (2012) (same).  Before granting federal habeas relief, "we must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt . . . was objectively unreasonable." Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011), *cert. denied sub nom.* Boyer v. Premo, 132 S.Ct. 2723 (U.S. Jun. 4, 2012); *see* Renico, 559 U.S. at 773; *see also* McDaniel v. Brown, -- U.S. --, 130 S.Ct. 665, 673 (2010) (reversing a habeas grant for misapplication of the Jackson standard, observing the Court of Appeals correctly "acknowledged that it must review the evidence in the light most favorable to the prosecution, but the court's recitation of inconsistencies in the testimony shows it failed to do that").

Throop relies for this claim on arguments he presented in FAP Ground Four, expecting the Court to credit those claims as established facts and to substitute his interpretation of the evidence for that of his jury and of the state courts. He summarily represents that the State courts:

> . . . failed to give objective consideration to the substantial and injurious influence upon those convictions attributed to the false evidence introduced by the prosecuting agency. As previously shown, the linchpin of those counts was the credibility of eyewitness testimony (and identification procedures) neither of which proved beyond a reasonable doubt that prisoners could have believably acquired MK-9 weapons necessary to commit the specific offenses. By first eliminating Lt. Hunt's false testimony, rational common sense will show that it was impossible for the alleged victims to have been battered by petitioner because it hasn't been shown that guards relinquished possession of said weapon to any prisoner.

(FAP 30, ECF No. 10.)

This Court may not disturb the state courts' rejection of this claim based on Throop's arguments. "[T]he assessment of the credibility of witnesses is generally beyond the scope of review." Schlup, 513 U.S. at 330; see Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under Jackson"). In addition, Throop exaggerates the inference to be drawn from the fact that the jury acquitted him of three of the five battery charges for which he was tried when he states: "The jury's . . . verdict to acquit petitioner of [battery against Leamons, Alvarez, and Drennon] demonstrates that those 3 batteries did NOT happen at all, and therefore these witnesses [i.e., "the bulk of prosecution witnesses [presented] to support the allegations that Leamons, Alvarez and Drennon had been hit with pepperspray discharged by a prisoner"] cannot have a ponderable legal significance to substantiate the remaining 2 convictions for the identical evidence." (FAP 30, ECF No. 10.) Even if Throop's two convictions and three acquittals could be characterized as "inconsistent verdicts," a dubious proposition in this case, the United States Supreme Court has observed: " 'The most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's

guilt.' " United States v. Powell, 469 U.S. 57, 64-65 (1984) (citation omitted).

The court of appeal on direct review of his convictions rejected as without merit Throop's "inconsistent verdict" argument, where he presented it in the context of his challenge to the trial court's denial of his new trial motion. The court applied abuse of discretion standards to that determination, but rejected the claim only after also determining the evidence was sufficient to support the verdicts.

> At the hearing on the new trial motion, the trial court stated it initially had been surprised the jury convicted Throop of only two counts and acquitted him of the remaining three counts. However, the trial court noted that after it reviewed the trial testimony of various witnesses, including Johnson and Morales, the trial court found the "jurors could rationally find [Throop] . . . guilty of some charges and not guilty of others." The trial court noted it would be "unbelievable" under the circumstances if all the officers remembered everything identically, inasmuch as there had been a stabbing and guards were being attacked by between 40 and 60 inmates. The court also noted the eyewitness testimony of Johnson and Morales who each "clearly" saw Throop spray them with pepper spray. Finally, the court noted the jury could have chosen to believe some of the witnesses' testimony and disregarded others, and found some of the evidence more convincing on certain counts than on others.

(Lodg. No. 10, slip op. at 21-22, 22-23: "Because of our conclusion that the trial court independently reviewed the evidence and properly found there was sufficient credible evidence to support the verdict, and our own independent review of the record that shows there is ample evidence to support the jury's verdict, we conclude reversal of his conviction is not warranted even if the verdict was inconsistent.")

The factual summary from the court of appeal's reasoned decision set forth above amply satisfies the Jackson standard and forecloses federal habeas relief on this theory. Respondent accurately extracts from the record the facts that "no less than seven witnesses, including the two victims whom Throop was convicted of assaulting, testified that they saw Throop spray officers with the pepper spray." (Answer 35, ECF No. 21-1.)

> The two victims [testified they] saw Throop spray them specifically. Only Officer Robin Alvarez, who was sprayed, did not know who her assailant was, but Hunt said it was Throop. This was overwhelming evidence of Throop's guilt with regard to the two counts for which he was convicted.

(Answer 28, ECF No. 21-1.)

12cv1870

The state court result on Throop's insufficient evidence ground for relief should not be disturbed, as it comports with controlling federal authority and is based on a reasonable determination of the facts from the record presented.  Relief on Ground Six should be **DENIED**.

## H.    No Evidentiary Hearing Warranted

Although Throop did not specifically request an evidentiary hearing in his FAP, Respondent argues in the Answer that he is not entitled to one.  (Ans. 36-37, ECF No. 21-1.)  In his Traverse, Throop "denies that he is not entitled to an evidentiary hearing," and represents that he offers "suggestions" for such a hearing in a "contemporaneously filed briefing" that this Court has neither identified nor would entertain.  (Traverse 2-3, ECF No. 39.)  In an August 19, 2013 order denying Throop's motion for appointment of counsel, the undersigned magistrate judge observed:  "it is not evident at this time that an evidentiary hearing is necessary."  (ECF No. 33 at 2; *see* Traverse 3, ECF No. 39.)  No discernable change in his circumstances warrants revising that opinion.

AEDPA prescribes the manner in which federal habeas courts must approach the factual record. In addition to the presumption of correctness attaching to a state court's determination of a factual issue, 28 U.S.C. § 2254(e)(1), section 2254(e)(2) substantially restricts "the discretion of federal habeas courts to take new evidence in an evidentiary hearing." Cullen, 131 S.Ct at 1400-01.  "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless the applicant shows that the claim relies on a new rule of constitutional law "made retroactive on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicated that could not have been previously discovered through the exercise of due diligence."  28 U.S.C. § 2254(e)(2)(A).  In the latter circumstance, the petitioner must also demonstrate that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2)(B).  De novo

review is only appropriate in federal habeas proceedings when the state courts did not reach the merits of a federal claim properly presented to it.  Cullen, 131 S.Ct at 1400-01; *see* Pirtle, 313 F.3d at 1167; Pace, 544 U.S. at 417; *see* Stokley, 659 F.3d at 808 (only on de novo review can a federal habeas court entertain new evidence).  Throop's claims are all subject to AEDPA's deferential standard of review.

Moreover, "a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts."  Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005), *citing* Lockyer, 538 U.S. at 71; *see* Schriro, 550 U.S. at 474.  "If a claim has been adjudicated on the merits by a state court," and "[i]f a claim subject to 28 U.S.C. § 2254(d)(1) does not satisfy that statutory requirement," it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim."  Cullen, 131 S.Ct at 1400-01; *see* Schriro, 550 U.S. at 474 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate").  A federal habeas petitioner "must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  Id. at 1400, n.7 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review" and an unreasonable determination of facts under § 2254(d)(2) must be found to be unreasonable "in light of the evidence presented in the State court proceeding").  It is recommended that the Court find on this record that an evidentiary hearing is neither warranted nor permissible under the AEDPA restrictions imposed by 28 U.S.C. §2254(e).  Throop's request should be **DENIED**.

For all the foregoing reasons, it is recommended that the Court find that the state court results on none of Throop's federal claims is contrary to or an unreasonable application of controlling federal authority and that the state courts made objectively reasonable factual determinations from the record in reaching their results.  *See* 28 U.S.C. § 2254(d).  As neither AEDPA exception to the deference federal habeas courts owe to state court results is satisfied here, and as Throop is not in custody in violation

of federal law, the Petition should be **DENIED**.  28 U.S.C. § 2254(a).

## III.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Larry Alan Burns under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For all the foregoing reasons, **IT IS RECOMMENDED** that this habeas Petition be **DENIED** in its entirety as the petitioner is not in custody in violation of any federal right, and that petitioner's request for an evidentiary hearing be **DENIED**.  **IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and adopting this Report and Recommendation and (2) directing that judgment be entered denying the Petition.

**IT IS HEREBY ORDERED** that no later than **March 28, 2014**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."  **IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than April 11, 2014.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).


DATED:  February 21, 2014

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court

12cv1870